**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**2910 GEORGIA AVENUE LLC,**
**a Delaware limited liability company,**
**c/o/ ASL Development Corp.**
**3 Barker Lane**
**Stratham NH 03885,**

                                        **Plaintiff,**

                        **v.**              **Civil Action No. 1:12- cv-1993**

**DISTRICT OF COLUMBIA,**
**a municipal corporation,**
**One Judiciary Square**
**441 Fourth Street, N.W.**
**Washington, DC 20001,**

**and**

**VINCENT C. GRAY, in his official capacity as**
**Mayor of the District of Columbia,**
**1350 Pennsylvania Avenue, N.W.**
**Washington, DC 20004;**

**and**

**MICHAEL P. KELLY, in his official capacity as**
**Director for the Department of Housing and**
**Community Development,**
**1800 Martin Luther King Avenue, S.E.**
**Washington, DC 20020**

                                        **Defendants.**

---

## COMPLAINT FOR MONETARY AND DECLARATORY RELIEF

*"We think, in short, that there are good reasons for our frequently expressed*
*belief that when the owner of real property has been called upon to sacrifice all*
*economically beneficial uses in the name of the common good, that is, to leave his*
*property economically idle, he has suffered a taking."*

Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1019 (1992)

The United States Supreme Court has long recognized that a governmental regulation can affect a taking of property if a regulation "goes too far." *Pennsylvania Coal Co. v. Mahou*, 260 U. S. 393, 415 (1922).   The District of Columbia's Inclusionary Zoning Program (D.C. Official Code § 6-1041.07 and implementing regulations at 14 DCMR § 2200, *et seq.* and 11 DCMR § 2600 *et seq.*) (the "Inclusionary Zoning Program") "goes too far" because for eighteen months Defendants have denied Plaintiff any economically viable use of its property—without providing any form of compensation whatsoever.   By bringing this action, Plaintiff seeks to prevent an unconstitutional, confiscatory and wrongheaded policy from further exacerbating the affordable housing shortage in the District of Columbia and depriving Plaintiff of its rights to property and substantive due process.   In support of its Complaint, Plaintiff alleges as follows:

## PARTIES

1.      Plaintiff 2910 Georgia Avenue LLC ("Plaintiff") is a Delaware limited liability company that owns the land and improvements for two condominium units located at 2910 Georgia Avenue, N.W., which are known for purposes of assessment and taxation as Lot 2004 in Square 2888 and Lot 2012 in Square 2888, both of which are situated in the District of Columbia.

2.      Defendant District of Columbia is responsible for enforcing and defending its laws and regulations.

3.      Defendant Vincent C. Gray ("Mayor Gray") is the Mayor of the District of Columbia, and is sued in his official capacity.   Mayor Gray is the chief executive officer of the District of Columbia responsible for directing, supervising and controlling the executive departments of the District of Columbia government.   D.C. Code § 1-204.22.   Mayor Gray is ultimately responsible for ensuring that the District of Columbia operates its Inclusionary Zoning Program in conformity with local and federal laws, including the U.S. Constitution.   The

2

"Inclusionary Zoning Program" is defined to mean all of the provisions of Chapter 26 of Title 11 of the District of Columbia Municipal Regulations (11 DCMR § 2600 *et seq*.), Subchapter II-A of Chapter 10, Title 6 of the D.C. Code, and the regulations promulgated under the authority of that subchapter.  *See* D.C. Code § 6-1041.01(4); 14 DMCR § 2200 *et seq.*

4.     Defendant Michael P. Kelly ("Kelly") is the Director for the Department of Housing and Community Development ("DHCD"), and is sued in his official capacity.  DHCD is an executive department of the District of Columbia established to create and preserve opportunities for affordable housing and economic development and to revitalize underserved communities in the District of Columbia.  DHCD is the agency charged with administering the Inclusionary Zoning Program.  Mr. Kelly, in his role as Director of DHCD, is responsible for the oversight, supervision, and control of DHCD's operations and is responsible for ensuring that the Inclusionary Zoning Program is implemented and operates in conformity with local and federal laws, including the U.S. Constitution.

5.     At all times relevant to this Complaint, Defendants have acted and continue to act under color of District of Columbia law and knew or should have known of the policies, practices, acts and conditions alleged herein.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343.  Plaintiff's claims for declaratory relief are authorized under 28 U.S.C. §§ 2201 and 2202.  Plaintiff's claims for monetary relief and an award of its reasonable attorney's fees and costs is authorized under 42 U.S.C. § 1983.  At all times relevant to his action, Defendants have acted under color of District of Columbia law.

7.      Venue lies in the District of Columbia pursuant to 28 U.S.C. § 1391(b)(1) because the Defendants reside in the District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District.

8.      Plaintiff's claims for violations of 42 U.S.C. § 1983 are asserted against Defendants Gray and Kelly in their official capacities.

## STATEMENT OF FACTS

*History of the Inclusionary Zoning Program*

9.      The Inclusionary Zoning Program was developed pursuant to the authority set forth in § 107 of the Inclusionary Zoning Implementation Amendment Act of 2006, effective March 14, 2007 (D.C. Law 16-275; D.C. Official Code § 6-1041.07) and Mayor's Order 2008-59, dated April 2, 2008.  Those documents mandate the adoption of a new Chapter 22 entitled "Inclusionary Zoning Implementation" of Title 14 (Housing) of the District of Columbia Municipal Regulations.  The Final Rulemaking for the Inclusionary Zoning Program's implementation was published by DHCD in the D.C. Register on December 11, 2009.

10.      In broad terms, the District's Inclusionary Zoning Program requires that a certain percentage of units in a new residential development, or a substantial rehabilitation that expands an existing residential building, be set aside as "affordable units" for low and moderate income households.  In exchange for requiring developers to sell certain units below market rates, developers are permitted to build more units through a "density bonus" (increased lot occupancy and height modifications to zoning restrictions) to offset their economic losses for below-market sales of the inclusionary units.  The program was intended to balance the policy goals of mixed income neighborhoods and increased homeownership opportunities for low and moderate income households with a bonus density incentive, so that the costs of the program are not borne unfairly by developers.

11.     The goals behind the Inclusionary Zoning Program are laudable.  But the program, as implemented, is a complete failure and has left units set aside for the program by Plaintiff unsellable for more than eighteen months--depriving Plaintiff of the economic value of its property.

12.     The Inclusionary Zoning Implementation regulations establish among other things, the process and prerequisites for obtaining building permits and certificates of occupancy for properties subject to the Inclusionary Zoning Program, the process for selecting households for the program, and the responsibilities and limitations on owners and tenants of inclusionary units.  *See* 14 DCMR § 2200.6.

13.     The regulations provide, among other things, that no building permit shall be issued for a development subject to the Inclusionary Zoning Program until the owner signs an Inclusionary Development Covenant.  *See* 14 DCMR § 2200.5.  A copy of the May 20, 2010 Inclusionary Development Covenant executed by the Plaintiff and recorded with the District of Columbia Recorder of Deeds is attached hereto as Exhibit A.

14.     As set forth in Article VIII of the Inclusionary Development Covenant, the Covenant is binding upon the Property and shall run with the land; no sale transfer or foreclosure shall affect the validity of the Covenant.  *See* Exhibit A at 8-9.  "In the event of foreclosure, this Covenant shall not be released, and the Mortgagee or any Person who takes title to an Inclusionary Unit though a foreclosure sale shall become a Transferee in accordance with Section 5.7."  *Id.* at 10.

15.     The Inclusionary Development Covenant contains a provision for release or extinguishment of the Covenant upon the reasonable approval of the DHCD Inclusionary Zoning Administrator.  *See* Exhibit A at Article X; *see also* 14 DCMR §2204.1(d).

16.     On March 14, 2012, DHCD published its 2011 Inclusionary Zoning Annual Report.  Although that 2011 Annual Report marked the conclusion of the third calendar year since implementation of the Inclusionary Zoning Program, a total of **two** inclusionary units have been produced in the District during that period.  Both of these units were set aside by Plaintiff at 2910 Georgia Avenue, N.W.  As of March 14, 2012, **zero** inclusionary units had been sold or rented under the Inclusionary Zoning Program.  And that figure remains true today.

17.     Despite years of legislation, rulemaking, debate, and planning for the implementation of inclusionary zoning in the District, not a single household has taken possession of an inclusionary unit under the Inclusionary Zoning Program.  The only effect that the Inclusionary Zoning Program has had is to discourage residential development and to deprive developers like Plaintiff of the economic value of their land.

***Plaintiff's Experience with the Inclusionary Zoning Program***

18.     The enactment and implementation of the District's IZ Program coincided with the global financial crisis of 2007-2009.  During this period, capital markets essentially froze and new investment in construction and housing starts declined substantially.  Many developers were forced to abandon projects at various stages of planning or completion—many large residential development projects in the District were in foreclosure or stood vacant in 2008 and 2009.

19.     Plaintiff was one of a handful of developers investing in new housing starts in the District during this period of financial turbulence.  Plaintiff purchased the property at 2910 Georgia Avenue, N.W. from Howard University in 2009 and planned to construct a twenty-two-unit condominium building.  Plaintiff retained Eric Colbert & Associates in July 2009 to design the building.

20.     Plaintiff's condominium development at 2910 Georgia Avenue, N.W. was the first matter of right condominium development in the District that was subject to the Inclusionary

Zoning Program.  Zoning review and approval was the final step before building permits were

issued.  Zoning approval was granted on or around March 10, 2010, but was subsequently

revoked due to the new Inclusionary Zoning Program requirements.  No mention of the

Inclusionary Zoning Program existed on the building permit application, nor in any of the

compliance, certification, or declaration forms.  The Inclusionary Zoning Covenant, attached

hereto as Exhibit A, had not even been drafted.  The Inclusionary Zoning Program and

requirements were a complete surprise to Plaintiff after the zoning approval process was already

completed.

    21.    Plaintiff was then presented with a Hobson's Choice—spend several months and

tens of thousands of dollars to redesign the entire development to incorporate the bonus density

potentially available under the newly-created Inclusionary Zoning Program, or provide the

District with the required percentage of affordable dwelling units based on the original design.

Plaintiff had no choice but to set aside two of the twenty-two units under the Inclusionary Zoning

Program (at a cost of several hundred thousand dollars for below-market pricing). Plaintiff

derived no benefit from the bonus density incentives in the regulatory scheme because no bonus

density was included in the design.  Plaintiff executed the required Inclusionary Development

Covenant on May 20, 2010 and obtained a Certificate of Zoning Compliance in June 2010.

    22.    DHCD began to officially market the two inclusionary units in May 2011.  DHCD

held its first lottery for the units from a random selection of eligible registered applicants on June

14, 2011, pursuant to the regulations governing the selection of eligible households and conduct

of the selection lottery.  *See* 14 DCMR § 2208-2211.  Selected households were ranked based on

District residence, employment in the District and time on the lottery list. DHCD notified the

selected households on June 23, 2011, who were directed to follow up with DHCD and the

condominium's broker, McWilliams Ballard, to confirm or deny their interest in the unit(s).

Those households who confirmed interest were required to provide within forty-five days a

Declaration of Eligibility, Certification of Income, pre-qualification from a lender, and other

documents required by 14 DCMR § 2213.  None of the households selected in the first lottery

returned timely the required certifications.

23.     A second lottery was held on August 11, 2011.  Only one selected household even

scheduled a visit of the units.  None of those selected in the lottery met the qualification

requirements of the Inclusionary Zoning Program.

24.     On information and belief, mortgage lenders are unwilling to extend a mortgage

loan to a condominium unit subject to the District's Inclusionary Development Covenant, which

substantially restricts a lender's ability to foreclose and resell the property in the event of default.

Because no purchase contract has ever been produced for either unit (usually a requirement for

mortgage underwriting), Plaintiff does not know if any potential buyer who applied for a

mortgage approval was rejected on that basis.

25.     Despite Plaintiff's and its broker's efforts to follow up (sometimes for months)

with every lead, DHCD's lotteries produced no qualified household ready, willing, and able to

purchase these units.

26.     After the two lotteries failed to identify a single potential purchaser of either

inclusionary unit, on November 18, 2011, DHCD opened registration for an alternative selection

procedure under 14 DCMR §2210.6 for the two inclusionary units.  As in the lottery process,

several registrants were identified as potential candidates to purchase these units--but no

candidate was qualified or otherwise able to purchase either unit as a result of the alternative

selection procedure.

27.     The twenty other units in Plaintiff's building at 2910 Georgia Avenue, N.W. were all sold at market rates between $225,000 and $404,000 within four months.

28.     After six months of failed efforts to identify even one qualified purchaser for either inclusionary unit, on December 20, 2011 (and several times thereafter) Plaintiff's managing member, Mr. Art Linde, contacted DHCD to request relief from this failed program. Mr. Linde's e-mails to DHCD went unanswered for nearly two months between January 2012 and March 2012.  When DHCD finally did reply to Mr. Linde, he was simply advised that DHCD was "considering additional marketing options" for the two units (without describing what those options were); DHCD invited Mr. Linde to submit comments to the agency regarding his experiences with the Inclusionary Zoning Program.

29.     On March 19, 2012, Mr. Linde wrote to DHCD and noted that 14 DCMR § 2204.1(d) allows for the release of the Inclusionary Zoning Covenant at the reasonable discretion of the DHCD IZ Administrator.  *See* Exhibit A at Article X.  DHCD's response on March 20, 2012 was that this provision only permits "release of the IZ [Inclusionary Zoning] covenant in the event of demolition or if the IZ Covenant needs to be corrected . . . Administrative Regulations do not give DHCD the authority to exempt a project from the IZ Program."  A copy of this March 2012 e-mail exchange is attached hereto as Exhibit B.

30.     DHCD provided no basis or authority for that interpretation, which is plainly contradicted by the plain language of the relevant regulation and the Inclusionary Zoning Covenant.  Indeed, 14 DCMR § 2204.1 provides that the covenant may be released or extinguished upon the "reasonable approval of the Department of Housing and Community Development Inclusionary Zoning Administrator."  And, Article X of the Inclusionary Development Covenant expressly provides that "this Covenant may be released or extinguished

upon the reasonable approval of the District Agency."  Moreover, 14 DCMR § 2223.1(c)

provides that DHCD may waive the application of any provision of the IZ regulations if

"[a]pplication of the provision is burdensome."

31.     After two failed lotteries and a secondary selection process that identified no

viable purchasers, DHCD became less communicative and responsive to Plaintiff's questions and

requests for guidance as to how it and this program was to proceed after a year of unsuccessful

efforts to sell these units.  In recent months, DHCD has provided no information about its

marketing efforts to prospective buyers for these units or how Plaintiff should be compensated as

a result of these imposed vacancies, which cannot be sold even at the reduced pricing set under

the Inclusionary Zoning Program.

32.     The District finally recognized in August 2012 that the Inclusionary Zoning

Program was not working.  Among other things, the Inclusionary Zoning Covenant that the

District requires all owners to sign and record survives foreclosure does not meet FHA lending

requirements; this effectively bars otherwise eligible candidates for the Inclusionary Zoning

Program from obtaining mortgage financing in the first instance.  On August 24, 2012, the

Zoning Commission enacted an emergency rulemaking (Z.C. Case No. 04-33F) that purported to

address FHA regulations that prevent extension of mortgage insurance if a mortgaged property is

subject to legal restrictions on conveyance.  *See, e.g.,* 24 CFR §203.41(b).  In this emergency

rulemaking, the Zoning Commission expressly recognized that the Inclusionary Zoning

Covenant restrictions render units "effectively unmarketable" and create "additional hardship for

developers at a time of continued economic uncertainty"; an effective admission that DHCD's

Inclusionary Zoning Program had deprived, and continues to deprive, Mr. Linde of the economic

use of his property. A copy of the August 2012 emergency rulemaking is attached hereto as Exhibit C.

33.     Despite this emergency rulemaking, to date no qualified candidates have expressed interest and ability to purchase either of the two units at their current pricing under the Inclusionary Zoning Program--which is discounted roughly 50% below market.

34.     In November 2012, DHCD held yet another lottery.  On November 9, 2012, DHCD mailed letters to seventy-two households deemed potentially eligible to purchase these two inclusionary units.  Twenty-nine of the latest lottery "winners" were households selected in prior lotteries or the alternate selection process.  In an extreme example, one of the "winners" has been "approved" four times in these selections; once for Unit 2-02 and three times for Unit C-02.

35.     The Household Interest Confirmation form that DHCD sent to the households identified in the most recent lottery is attached hereto as Exhibit D.  This form contains a variety of inconsistent messages to prospective purchasers.  It states at the top that this form is for a "For Sale Inclusionary Unit," with a minimum sale price of $145,200.  It further recites that within 45 days the applicant must provide "[a] pre-qualification letter from a lender indicating your Household's creditworthiness and ability to afford the Purchase Price."  But the form also states that the applicant has 60 days in which "to execute a *lease* for the Inclusionary Unit" and that "[f]ailure to meet any deadline will render the Household ineligible to *rent* the above Inclusionary Unit . . . ." (Emphasis added.)  It is wholly unclear whether the notice concerns purchasing or leasing these units.  This mixed message to prospective purchasers underscores the confusion that has been the hallmark of this program since its inception.

36.     The programmatic deadline to meet all approvals and to execute a purchase and sale agreement for any household identified in the November 2012 lottery is January 10, 2013.

Any purchaser has sixty days thereafter to settle on the property—an outside closing deadline of approximately March 10, 2013.  To date, no household identified in the most recent lottery have submitted any of the required certifications.  Based upon the experiences of the previous eighteen months, there is no reason to expect that any actual buyer will be identified in this process for either unit.

37.     On November 19, 2012, the Zoning Commission enacted another emergency rulemaking that inclusionary zoning restrictions will automatically terminate in the event the property is transferred by foreclosure or deed-in-lieu of foreclosure.  These latest emergency zoning regulations purport to address lender concerns and HUD guidelines, but they will expire on March 19, 2013 pending a formal notice and comment rulemaking.  After that, it is entirely unclear what, if any, foreclosure restrictions will be imposed under the District's Inclusionary Zoning Program.

38.     Neither the expiring emergency rules, nor any future amendment of the regulations (whatever they may be), bear any consequence on the existing and recorded Inclusionary Development Covenant that Plaintiff and the District executed in May 2010, which restrictions run with the land and render these units unsellable.  Indeed, DHCD recently advised Plaintiff that "once a covenant is executed it should essentially reflect a contract that could not be amended without the consent of both parties.  So owners have certain expectations of rights and the banks will see their rights to foreclose on the property in question regardless of what new regulations state."  *See* December 7, 2012 e-mail from A. Rodgers to A. Linde, attached hereto as Exhibit E.

39.     Since the Inclusionary Zoning Program was implemented in 2009, the District has failed to provide any clarity or predictability to prospective purchasers who may find themselves

unable to sell these homes in the future, to lenders expected to extend mortgage credit for these homes, or to other developers who are likely to end up in Plaintiff's situation—holding indefinitely vacant units for which no bank will lend and that are impossible to sell to moderate income families under this failed program.

40.     On November 29, 2012, Plaintiff's counsel sent Defendant Kelly a letter explaining why the District's Inclusionary Zoning Program is both a practical failure and poses an unconstitutional deprivation of Plaintiff's property and other legal rights.  A copy of that November 29, 2012 letter is attached hereto as Exhibit F.  Plaintiff requested the courtesy of a response by December 7, 2012.  DHCD's General Counsel advised Plaintiff's counsel that DHCD could offer no solution at this time, but reiterated that DHCD would not release the Inclusionary Zoning Covenant.

41.     Because DHCD has refused to release or extinguish the Inclusionary Development Covenant under any of the regulatory or Covenant mechanisms available, Plaintiff is forced to bring the instant suit for declaratory and monetary relief.

## CASE OR CONTROVERSY

42.     This action presents a live, ripe and actual case or controversy arising under the Constitution and the laws of the United States and the laws of the District of Columbia.

43.     Plaintiff has brought this action because the Inclusionary Zoning Program, on its face and/or as applied, violates Plaintiff's rights under the Fifth and Fourteenth Amendments of the Constitution of the United States and Plaintiff's rights to due process of law.

44.     Plaintiff has standing to sue because it owns two vacant condominium units in the building located at 2910 Georgia Avenue, N.W. that have been set aside for the Inclusionary Zoning Program; Plaintiff has substantial property rights and investment-backed expectations in said units that have been and continue to be impeded, frustrated, and impaired by the District and

officials who oversee that program.  Plaintiff received neither bonus density nor any other compensation in exchange for setting aside two condominium units for the Inclusionary Zoning Program, which have remained vacant and unsold for over a year and a half.  If Plaintiff were permitted to sell these units at market prices, Plaintiff would have earned in excess of $600,000 of revenues from such sales.  In eighteen months, Plaintiff has been unable to sell these units even at the reduced sales prices required under the Inclusionary Zoning Program because the flaws in the program pose insuperable obstacles for any willing buyer to purchase them.

45.     Plaintiff has paid, and continues to pay, carrying costs for these properties, including but not limited to real property taxes, utilities, and condominium fees.  Plaintiff and its agents have also spent hundreds of hours of uncompensated time trying to market these properties within the constraints imposed by the Inclusionary Zoning Program, which efforts have been entirely wasted as a result of DHCD and District officials' refusal to address and solve numerous programmatic failings and deficiencies that Plaintiff has raised with them over the last two years.  Plaintiff has incurred, and continues to incur, these costs despite the fact that Plaintiff did not receive any of the developer benefits contemplated under the Inclusionary Zoning Program.

46.     The Inclusionary Zoning Program has affected at, an irreducible minimum, a temporary taking of Plaintiff's property and forced Plaintiff to pay these carrying costs and has denied Plaintiff economically viable use of its property since May 2011.

47.     After months of complying with every demand imposed by the District under the Inclusionary Zoning Program, Plaintiff has repeatedly sought a waiver, release or extinguishment of the Inclusionary Zoning Covenant and all other inclusionary zoning restrictions relevant to these two condominium units.  All such requests have been ignored or denied.

48.     In the three years since the District implemented the  Inclusionary Zoning Program, Plaintiff is the only developer who has been subject to the District's unconstitutional taking of housing units for program.  In three years, not a single low-income household has benefitted from the District's Inclusionary Zoning Program.  Plaintiff has been forced to bear the entire cost of the District's failed experiment.

49.     The District's Inclusionary Zoning Program, on its face, and/or as applied, unreasonably interferes with Plaintiff's (and all future similarly situated landowners') property rights.

50.     The District's Inclusionary Zoning Program does not advance any compelling, legitimate or substantial government objective or interest because it has demonstrably failed to benefit even a single low or moderate income household in more than three years.

51.     Plaintiff does not doubt that the District was attempting to address a governmental interest that is of genuine concern to District residents—a shortage of housing for low and moderate income households.  But Plaintiff vigorously disputes the effectiveness, reasonableness, proportionality, constitutionality and legality of the District's Inclusionary Zoning Program. The onerous terms of the Inclusionary Zoning Covenant that Plaintiff was required to sign and record as a precondition for building permit approval far exceed the scope of the inclusionary zoning laws that have been adopted in other jurisdictions and that have actually succeeded in placing moderate income households into homes of their own.

52.     The demonstrable failures of the Inclusionary Zoning Program underscore that the exactions imposed upon Plaintiff are grossly disproportionate and bear no reasonable nexus to the stated policy goals of the program.

53.     Defendants contend that the Inclusionary Zoning Program is lawful, valid, constitutional, properly enacted and administered.

54.     Defendants assert that the Inclusionary Zoning Program requirements will be enforced as enacted, notwithstanding the inability to sell Plaintiff's inclusionary units for over eighteen months.  Defendants have refused to release, waive, or extinguish Plaintiff's Inclusionary Zoning Covenant.  Plaintiff's most recent requests for relief have been ignored by Defendants; any further demand or attempted recourse would be futile.

55.     All conditions precedent to Plaintiff's capacity and standing to bring these claims have occurred or been performed.

## COUNT I

### 42 U.S.C. § 1983 CLAIM FOR JUST COMPENSATION UNDER THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION)

56.     Paragraphs 1-55 are realleged and hereby incorporated by reference.

57.     The Fifth Amendment to the United States Constitution states that "private property [shall not] be taken for public use without just compensation."

58.     The mandatory affordable housing set-aside, Inclusionary Zoning Covenant restrictions, and other requirements of the Inclusionary Zoning Program constitute exactions imposed as a condition to secure building permits, certificate of occupancy, or other approvals from the District of Columbia for residential developments and rehabilitations.

59.     Government appropriation of private property to correct market imbalances within the District of Columbia housing market or achieve other public purposes is traditionally a public function exercised through eminent domain powers, including the provision of just compensation, as exemplified in *Berman v. Parker*, 348 U.S. 26 (1954).  In *Berman*, the Supreme Court held constitutional the District of Columbia Redevelopment Act of 1945, which

provided both for the comprehensive use of the eminent domain power to redevelop slum areas and for the possible sale or lease of the condemned lands to private interests.  Unlike the statute upheld in *Berman*, however, through enactment of the Inclusionary Zoning Program, Defendants have improperly evaded their constitutional obligation to provide just compensation for appropriations of Plaintiff's private property in fulfillment of public objectives.  Moreover, it is a demonstrable fact that no public objective has been served as a result of the District's uncompensated taking of Plaintiff's property, because no inclusionary unit has been sold and no lower-income household has purchased as home in the program's three-year history.

60.     Supreme Court precedents stake out two categories of regulatory action that are generally deemed *per se* takings for Fifth Amendment purposes: (1) where the government requires an owner to suffer a permanent physical invasion of her property; and (2) where, as here, the government imposes regulations that completely deprive an owner of "all economically beneficial us[e]" of its property.  *Lucas*, 505 U.S., at 1019; *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) ("We held in *Lucas* that the government must pay just compensation for such "total regulatory takings").  Over the last eighteen months, Defendants have affected a total regulatory taking by depriving Plaintiff any opportunity to sell these condominium units.

61.     Even if an inclusionary unit was eventually purchased by a lower-income household pursuant to the requirements of the Inclusionary Zoning Program, the complex formula for determining resale price and the deed restrictions imposed through the Inclusionary Zoning Covenant upon resale may well render moderate income buyers unable to sell their homes in a reasonable period of time and could make them financial prisoners to their homes.

62.     Plaintiff neither caused nor contributed to any affordable housing shortage in the District of Columbia.  To the contrary, Plaintiff was one of very few developers actively building

new housing alternatives for middle-class and first-time homebuyers in the District during the recessionary period of 2007-2010.

63.     The Inclusionary Zoning Program has arbitrarily and unreasonably imposed harsh development exactions and has forced Plaintiff to bear alone burdens which, in all fairness and justice, should be borne by the public as a whole.  As noted above, DHCD's 2011 Annual Report marked the conclusion of the third calendar year since implementation of the Inclusionary Zoning Program; a total of **two** inclusionary units have been produced in the District during that period and **both** of these units were set aside by Plaintiff at 2910 Georgia Avenue, N.W. Plaintiff has borne substantial economic loss and continues to pay carrying costs for these properties as a result of this program for eighteen months—and the units remain vacant, unsold, and unused.

64.     The Inclusionary Zoning Program was enacted and has been administered by District officials despite an absence of an essential, close nexus between the affordable housing problems in the District and the impact to which the development exactions affect developers like Plaintiff, as required under *Nollan v. Calif. Coastal Comm'n*, 483 U.S. 825 (1987).

65.     The Inclusionary Zoning Program was enacted and has been administered by District officials despite the absence of evidence showing that the relationship, if any, between the impact of any future or proposed development and the development exactions imposed by, among other things, the Inclusionary Zoning Covenant, is roughly proportional as required by *Dolan v. City of Tigard*, 512 U.S. 374 (1994).

66.     Defendants' imposition of development exactions under the Inclusionary Zoning Program constitutes a taking in violation of the Fifth Amendment of the United States Constitution.  *See Lucas*, 505 U.S., at 1019; *Lingle*, 544 U.S. at 538.

67.     The Inclusionary Zoning Program also improperly effects a taking of private property in violation of Plaintiff's constitutional rights because the required exactions are so high, harsh and extreme that they effectively deny landowners like Plaintiff the right to the economically viable use of their land and leave them no reasonable return on their investment.

68.     The Inclusionary Zoning Program imposes a development exaction program that by its provisions allows for both the discretionary deployment of governmental police power and the enhanced potential for its abuse in its application.

69.     The official policy and course of conduct of Defendants Gray and Kelly, acting under color of state law, have deprived Plaintiff of rights, privileges and immunities secured by the United States Constitution, in violation of 42 U.S.C. § 1983

70.     But for the actions of Defendants, Plaintiff would have been able to have contracted for and to have completed the sale of the two condominium units that were set aside eighteen months ago for the Inclusionary Zoning Program.

71.     But for the actions of the Defendants, the subject properties would have had a fair market value realizable by Plaintiffs of not less than $600,000.  Plaintiff is entitled to just compensation equal to the combined values of the subject properties, together with interest thereon from and after such takings, plus all related carrying costs for these properties since May 2011, including without limitation real estate taxes, utilities, condominium fees and other costs.

72.     The Defendants dispute that the Inclusionary Zoning Program or its application constitutes a taking for which any compensation is due.

73.     The actions taken by Defendants in enacting the Inclusionary Zoning Program constitutes a public taking for which compensation is due.  Plaintiff has received no benefit or compensation whatsoever from Defendants as compensation for any of the exactions imposed.

74.     Alternatively and in addition, the Inclusionary Zoning Program constitutes a facially unconstitutional private use taking.  The Inclusionary Zoning Program authorizes the District to demand that developers set aside private property for sale at below market prices to other private individuals who are selected by the District and DHCD.

## COUNT II

## UNCONSTITUTIONAL DEPRIVATION OF SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION RIGHTS (U.S. CONSTITUTION AMEND. V)

75.     Paragraphs 1-74 are realleged and hereby incorporated by reference.

76.     The Fourteenth Amendment to the Constitution of the United States provides that no state shall "deprive any person of life, liberty, or property, without due process of law" nor "deny to any person the equal protection of the laws." U.S. Const., Amend. XIV. This constitutional protection requires that legislative acts be reasonably related to legitimate public purposes, and that legislation that burdens a particular class of persons have a rational basis.  In *Bolling v. Sharpe*, 347 U.S. 497 (1954), the Supreme Court read the Fourteenth Amendment equal protection clause into the due process clause of the Fifth Amendment to apply it to the District of Columbia.  *Id*. at 499.

77.     Defendants did not, at any time material hereto, have any standards for conducting their Inclusionary Zoning Program to ensure that inclusionary properties generally, or the subject properties specifically, would be sold or saleable within a reasonable time of the Defendants' stated intent to take such properties.

78.     Defendants did not, at any time material hereto, either have or provide to Plaintiff any procedures that would have allowed the Plaintiffs to challenge the Defendants' actions or their inactions, either at all or in a timely manner and meaningful way.  Defendants and DHCD

are vested with discretion to release or waive Plaintiff's Inclusionary Zoning Covenant, but have consistently refused Plaintiff's requests to provide a waiver or release.

79.     The Inclusionary Zoning Program violates Plaintiff's substantive due process and equal protection rights because it is arbitrary, capricious, unreasonable, confiscatory, and not rationally related to the purported legislative purpose of addressing the affordable housing shortage in the District of Columbia, while simultaneously depriving landowners like Plaintiff their property rights and any realistic opportunity to make a fair return on their investments.

## COUNT III

## DECLARATORY JUDGMENT

80.     Paragraphs 1-79 are realleged and hereby incorporated by reference.

81.     The U.S. Constitution prohibits the District and its officials from arbitrarily singling out certain property owners to bear the burden of providing general public benefits.  One of the principal purposes of the Takings Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Nollan v. Calif. Coastal Comm'n*, 483 U.S. at 835, n.4.

82.     As set forth above, the District's Inclusionary Zoning Program does not substantially advance legitimate state interests and it denies Plaintiff the economically viable use of its land.

83.     A governmentally compelled transfer of property from one person to another is the very essence of a "taking."  *See, e.g., Wilkinson v. Leland*, 27 U.S. 627, 658 (1829).  In this case, the District government has compelled Plaintiff to set aside two units at greatly reduced sales prices in order to place moderate-income households into these units in perpetuity.  But Plaintiff received no compensation for this set-aside (not even the bonus density contemplated by statute to offset the developers' economic losses for the mandatory set-asides).  Worse, the units

have remained vacant, unsold, and hostage to this failed program for more than eighteen months and not a single family has been helped.

84.    Plaintiff is entitled to a declaratory judgment that: (1) the Inclusionary Zoning Program is unconstitutional; (2) that Defendants Gray and Kelly, acting under color of state law, have deprived Plaintiff of rights, privileges and immunities secured by the United States Constitution, in violation of 42 U.S.C. § 1983; and (3) that Plaintiff is entitled to compensation.

WHEREFORE, Plaintiff prays that this Court may hear the case and that this Court:

A.    Award monetary damages or just compensation to Plaintiff and against the District of Columbia in an amount to be determined to fairly compensate Plaintiff for its actual costs and damages incurred as a result of the exactions imposed by Defendants acting under color of District law, including the Inclusionary Zoning Program;  and

B.    Find and declare that:

(1) Defendants have taken two condominium units located at 2910 Georgia Avenue, N.W., Washington D.C. that are owned by Plaintiff;

(2) The Inclusionary Zoning Program is unconstitutional because it impermissibly violates the Takings Clause of the U.S. Constitution;

(3) The Inclusionary Zoning Program is unconstitutional because it impermissibly violates Plaintiff's substantive due process and equal protection rights guaranteed by the U.S. Constitution, Amends. V and XIV;

(4) The Inclusionary Zoning Program, as implemented and enforced by District officials, including Defendants Gray and Kelly, violates Plaintiff's civil rights under 42 U.S.C. § 1983;

(5) The May 20, 2010 Inclusionary Zoning Covenant executed between Plaintiff

and the District is a nullity and imposes no deed restriction upon sale or

transfer of the properties; and

C.      Award Plaintiff its costs and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and

1988, and grant Plaintiff such other and further relief as this Court may deem just and proper.


Dated: December 13, 2012            Respectfully submitted,

                                    ARENT FOX LLP

                                    /s/ *James H. Hulme*_____
                                    James H. Hulme (#323014)
                                    Matthew M. Wright (#474731)
                                    Arent Fox LLP
                                    1717 K Street, N.W.
                                    Washington, D.C. 20036-5342
                                    (202) 857-6000/Telephone
                                    (202) 857-6395/Facsimile

                                    *Attorneys for Plaintiff 2910 Georgia Avenue LLC*