# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| 2910 GEORGIA AVENUE LLC,<br><br>  Plaintiff,<br><br>  v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>  Defendants. | **Civil Action No. 12-1993 (CKK)** |

## MEMORANDUM OPINION
(February 14, 2017)

Plaintiff 2910 Georgia Avenue LLC filed suit against the District of Columbia, Mayor Muriel Bowser, and Polly Donaldson in her official capacity as Director of the Department of Housing and Community Development ("DHCD"),[1] alleging that the application of the District's Inclusionary Zoning Program ("IZ Program") to the development of a 22-unit condominium building near Howard University constituted an unconstitutional taking and violated Plaintiff's due process and equal protection rights.  Presently before the Court are Defendants' [67] Renewed Motion for Summary Judgment and Plaintiff's [68] Motion for Summary Judgment.

Upon consideration of the pleadings,[2] the relevant legal authorities, and the record for the purposes of these motions, the Court finds that Defendants are entitled to summary judgment on

---

[1]  Pursuant to Fed. R. Civ. P. 25(d), Muriel Bowser and Polly Donaldson have been automatically substituted for Vincent C. Gray and Michael P. Kelly, whom the parties' pleadings name as Defendants.

[2]  The Court's analysis has focused on the following documents: Defs.' Renewed Mot. for Summ. J. ("Defs.' Mot."), ECF No. 67; Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 68; Defs.' Opp'n to Pl.'s Mot. for Summ. J. ("Defs.' Opp'n"), ECF No. 71; Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 70; Defs.' Reply in Support of Mot. for Summ. J. ("Defs.' Reply"), ECF No. 72; Pl.'s Reply in Support of Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 73. The Court has also reviewed all of the evidentiary material attached to these documents.  In an

each of Plaintiff's claims.  In so finding, the Court does not intend to minimize Plaintiff's

legitimate grievances with the District's administration of the IZ Program, or to suggest that the

District acted perfectly at all times.  The Court merely concludes that at no point did the

District's conduct rise to the level of a violation of the United States Constitution.

First, the Court finds that the economic effect of the challenged regulations on Plaintiff's

condominium building is not sufficient to establish a takings claim as a matter of law.  Second,

Plaintiff has not established an equal protection claim because it has not demonstrated that it was

treated differently by the District than any other developer subject to the IZ Program.  Third,

Plaintiff has not established a substantive due process claim because the conduct of the District

at issue demonstrates, at most, confusion or negligence; it does not approach the level of grave

unfairness or deliberate flouting of the law that is required for such a claim.  Finally, Plaintiff's

procedural due process claim also fails because Plaintiff has not established that the IZ Program

deprived Plaintiff of any protected property interests without sufficient process of law.

Accordingly, Defendants' motion for summary judgment is GRANTED and Plaintiff's motion is

DENIED.

## I.  BACKGROUND

### A.  The Basics of the District of Columbia IZ Program

As relevant to the parties' dispute, the District of Columbia's IZ Program requires that 8-

10 percent of the gross floor area of new residential developments (or substantial additions to

existing developments) in the District be used for sale or lease to eligible low- and moderate-

---

exercise of its discretion, the Court finds that holding oral argument in this action would not be of
assistance in rendering a decision.  *See* LCvR 7(f).

income households at certain maximum price levels. D.C. Mun. Regs. tit. 11, § 2603.[3] The

affordable units created by the program are referred to as inclusionary units ("IZ Units"). *Id.* §

2601.1. The District enacted the IZ Program in order to "increas[e] the amount and expand[ ] the

geographic distribution of adequate, affordable housing available to current and future

residents." *Id.* § 2600.1. Under the IZ Program, "no building permit shall be issued" unless the

owner of the development subject to the IZ Program "records a covenant in the land records of

the District of Columbia that binds all persons with a property interest in any or all of the

[property] to construct and reserve the number of inclusionary units." D.C. Code § 6-1041.05(a)

("IZ Covenant").

**B.  The History of the IZ Program Rulemaking**

The IZ Program was established by the District of Columbia Zoning Commission on

August 25, 2006. Pl.'s Stmt. of Undisputed Material Facts, ECF No. 68-2 ("Pl.'s Stmt."), ¶ 3.

The Zoning Commission delegated responsibility for developing the IZ Program to the Council

of the District of Columbia ("D.C. Council") and the Mayor, who subsequently delegated that

authority to the Deputy Mayor for Planning and Economic Development ("Deputy Mayor"). *Id.*

¶¶ 3, 5; Pl.'s Mot., Ex. 3, ECF No. 68-5 (Delegation of Authority – Inclusionary Zoning

Implementation Act of 2006). The program was established pursuant to statutory authority set

forth in section 107 of the Inclusionary Zoning Implementation Amendment Act of 2006. *Id.* ¶

4.

Although on the books as of 2006, the IZ Program was not implemented until certain

rules and regulations were passed regarding its implementation. On April 11, 2008, the District,

---

[3] The Court refers in this Memorandum Opinion to D.C. Municipal Regulations by the section numbers in place during the time frame relevant to the parties' dispute.

through the Deputy Mayor, issued a Notice of Proposed Rulemaking for regulations that would implement and establish the procedures for the IZ Program. *Id.* ¶ 8; Pl.'s Mot., Ex. 6, ECF No. 68-8 (Notice of Proposed Rulemaking for Chapter 22 of Title 14 of the District of Columbia Municipal Regulations, entitled "Inclusionary Zoning Implementation"). Among other things, these regulations established the process and the requirements for obtaining building permits for properties subject to the IZ Program. Pl.'s Stmt. ¶¶ 8, 26; Pl.'s Mot., Ex. 6. The Notice of Proposed Rulemaking stated that "[f]inal rulemaking action shall be taken in not less than sixty (60) days from the date of publication of this notice in the *D.C. Register*." Pl.'s Mot., Ex. 6 at 1. It also stated that the "[t]he Deputy Mayor [ ] intends that the final rules shall not become effective until ninety (90) days after publication of the Notice of Final Rulemaking in the *D.C. Register* in order to allow a transition period between publication and implementation." *Id.*

In the months after the Notice of Proposed Rulemaking was published, the District began to express its concern, in a series of published resolutions, that the IZ Program was not being implemented quickly enough. On October 21, 2008, the D.C. Council passed Resolution 17-848, which referenced the April 11, 2008 Notice of Proposed Rulemaking and noted that "final rulemaking, including the maximum rent and purchase price schedule [for the IZ Program] has not been published. Because final regulations have not been promulgated . . . and the maximum rent and purchase price schedule has not been published . . . the Inclusionary Zoning Program has not been implemented." Pl.'s Mot., Ex. 11, ECF No. 68-13 (D.C. Council Resolution 17-848). This resolution also stated that "[c]ontinuing delays [in implementing the IZ Program] have resulted in the loss of affordable mixed-income units being included in many residential developments" and that "[e]mergency legislation is need[ed] to provide that the final rulemaking and publication requirements for the Inclusionary Zoning Program be met expeditiously." *Id.*

4

On November 18, 2008, the D.C. Council passed Resolution 17-871, again stating that final rulemaking had not been published and again declaring an emergency as to the need to publish final rulemaking expeditiously so as to not lose further affordable housing in new developments.  Pl.'s Mot., Ex. 12, ECF No. 68-14 (D.C. Council Resolution 17-871).  This resolution also stated that "[t]he Administration has stated that because of significant changes that will be made to the proposed rulemaking based on comments received since the initial notice of proposed rulemaking, a revised notice of proposed rulemaking will be published for public comment."  *Id.*  It also stated that "[t]he Administration has further stated that 90 days are needed for District agencies to finalize plans for the implementation of the rules after the notice of final rulemaking is published."  *Id.*

As promised, a Revised Notice of Proposed Rulemaking was then published on December 26, 2008, incorporating certain changes to the proposed rules.  Pl.'s Mot., Ex. 13, ECF No. 68-15 (Revised Notice of Proposed Rulemaking).  Of some note, the Revised Notice stated that "[t]he Deputy Mayor . . . intends that the final rules shall not become effective until sixty (60) days after the publication of the Notice of Final Rulemaking in the *D.C. Register*," which was thirty days less than the 90-day phase-in period envisioned in the initial proposed rulemaking.  *Id.* at 1.  The Revised Notice also stated that it replaced the initial notice, and that "[f]inal rulemaking action shall be taken in not less than thirty (30) days from the date of publication of this notice."  *Id.*

By February 3, 2009, final rulemaking still had not been published, and the D.C. Council adopted another emergency resolution regarding the need for final rulemaking.  Pl.'s Mot., Ex. 14, ECF No. 68-16 (D.C. Council Resolution 18-22).  This resolution referenced the same emergency need for affordable housing as the emergency resolutions that predated it, and again

noted that "[t]he Administration . . . stated that 90 days were needed for District Agencies to finalize plans for the implementation of the rules after the notice of final rulemaking is published." *Id.* at 1.

The Notice of Final Rulemaking for these IZ Program regulations was then published on May 15, 2009.  Pl.'s Stmt. ¶ 20; Pl.'s Mot., Ex. 18, ECF No. 68-20 (Notice of Final Rulemaking).  Plaintiff contends that when this Notice was published, it was "not known, clear, or stated" when the rules were to become effective and applicable.  Pl.'s Stmt. ¶ 20.  As discussed in more detail later in this Memorandum Opinion, a number of Plaintiff's legal arguments are premised on this claim.  This claim is not, however, supported by the record, and the Court rejects it at the outset.  The Notice stated that "[t]hese final rules shall become effective on the date of publication of this notice in the *D.C. Register*, but . . . shall not become applicable until ninety (90) days after such publication or the date on which the final Maximum Rent and Price Schedule is published in the *D.C. Register*, whichever is later."  Pl.'s Mot., Ex. 18 at 1.  It is undisputed that the maximum rent and price schedule was published in the *D.C. Register* on August 14, 2009.  Pl.'s Stmt. ¶ 20; Pl.'s Mot., Ex. 19, ECF No. 68-21 (Inclusionary Zoning Affordable Housing Program Maximum Rent and Purchase Price Schedule).  Accordingly, the final rules became effective on August 14, 2009, after the lengthy notice and comment process described above and a significant "phase-in" period after publication of the Notice of Final Rulemaking.

Amendments to the IZ Program regulations were later made, but Plaintiff has provided absolutely no reason why the Court should excuse Plaintiff from having been on notice that the IZ Program was generally applicable, in all ways relevant to this case, as of August 14, 2009. On August 28, 2009, the Deputy Mayor published a Notice of Emergency and Proposed

6

Rulemaking, which gave notice of proposed amendments to the IZ Program rules.  Pl.'s Stmt. ¶¶
24-25; Pl.'s Mot., Ex. 21, ECF No. 68-23 (Notice of Emergency and Proposed Rulemaking).
Plaintiff does not contend that these amendments are relevant to the applicability of the program
to Plaintiff or to the claims in this case.  The emergency rulemaking notice stated that the
changes were needed to "fully implement" the IZ Program, but expressly acknowledged that the
IZ rules had otherwise already been "previously adopted" and had an "August 14, 2009 effective
date."  Pl.'s Mot., Ex. 21 at 1.  Accordingly, although the Notice of Final Rulemaking for *these
amendments* was not published until December 11, 2009, and became effective immediately on
that date, Pl.'s Mot., Ex. 22, ECF No. 68-24 (Notice of Final Rulemaking), the IZ Program had
otherwise, in all ways relevant to this case, already been in effect since August 14, 2009.

## C.  Plaintiff's Experience with the IZ Program

Plaintiff is a real estate company that invests in new housing in the District of Columbia.
On November 24, 2009, over three months after the IZ Program rules became effective and
applicable in the District, Plaintiff purchased the property at 2910 Georgia Avenue, N.W. from
Howard University.  Pl.'s Stmt. ¶ 19; Pl.'s Mot., Ex. 16, ECF No. 68-18 (Special Warranty Deed
for 2910 Georgia Avenue property).  Plaintiff purchased the property, then a vacant lot, for
$560,000.00.  Defs.' Stmt. of Material Facts for Which There is Not Genuine Dispute, ECF No.
67-30 ("Defs.' Stmt."), ¶ 25.  Plaintiff purchased this property with the intention of constructing
a 22-unit condominium building.  Pl.'s Stmt. ¶ 19.  It is undisputed that this entire development
project—the condominium building consisting of all 22 units—was a single investment for
financing and planning purposes.  Defs.' Stmt. ¶ 27.

Plaintiff subsequently, on December 23, 2009, filed a building permit application to
construct this condominium building.  Pl.'s Stmt. ¶ 28.  Even though the IZ Program was in

effect as of this date, on March 30, 2010 the D.C. Zoning Office initially indicated to Plaintiff that the project's zoning had been approved without requiring compliance with the IZ Program. *Id.* ¶ 31.  However, the office did not grant Plaintiff a building permit at this time.  The parties apparently do not dispute that communicating preliminary zoning approval without IZ compliance was an oversight on the part of the Zoning Office, apparently due to the fact that this was the first IZ Program building permit the office had handled.  *Id.* ¶ 30; Pl.'s Mot., Ex. 17, ECF No. 68-19 (January 23, 2015 Deposition of Mathew LeGrant), at 39:19-40:14. Subsequently, however, an employee at the District's Office of Planning discovered the mistake and, in April, 2010, the District informed Plaintiff that its zoning approval, and accordingly its ability to acquire a building permit, would be contingent on compliance with the IZ Program. Pl.'s Stmt. ¶¶ 32-35.  Plaintiff's condominium building was the first development in the District subject to the IZ Program.  *Id.* ¶ 35.

Developments that are subject to the IZ Program are allowed to take advantage of "bonus density," which gives developers the option to "construct up to twenty percent (20%) more gross floor area than permitted as a matter of right."  D.C. Mun. Regs. tit. 11, § 2604.1; *see also* Pl.'s Mot., Ex. 4, ECF No. 68-6 (DHCD webpage entitled "Inclusionary Zoning Affordable Housing Program").  Although the parties dispute Plaintiff's reasons for not doing so, it is undisputed that, after being told by the District in April, 2010 that its development was subject to IZ regulations, Plaintiff did not redesign its building plans to incorporate the "bonus density" made available under the IZ Program, opting instead to proceed forward with the building as planned.  Pl.'s Stmt. ¶ 36.  Plaintiff claims that it had "no choice" in the matter because to incorporate bonus density at this stage, "Plaintiff would have had to spend months and tens of thousands of

dollars," and add more parking.  Pl.'s Mot., Ex. 7, ECF No. 68-9 (June 28, 2015 Declaration of Arthur S. Linde), at ¶¶ 8-10.

On May 14, 2010, Plaintiff subdivided the separate lots that made up the property at 2910 Georgia Avenue into a single record lot.  Defs.' Stmt. ¶ 28.  On May 20, 2010, to satisfy the IZ Program's requirements that 8-10% of the development be used for affordable housing, Plaintiff signed an IZ Covenant binding two of the envisioned 22 condominium units within the planned building: Unit C-02 and Unit 2-02.  Pl.'s Stmt. ¶¶ 38, 42; Pl.'s Mot., Ex. 28, ECF No. 68-30 (Plaintiff's IZ Covenant).  The building was then constructed.  On September 11, 2011, after completing construction, Plaintiff subdivided the building into 22 residential units and 11 parking units.  Defs.' Stmt. ¶ 29.

Efforts then began to locate eligible low- and moderate-income purchasers for Plaintiff's IZ Units.  Plaintiff submitted a "Notice of Availability" to Defendants on May 12, 2011, indicating that the two IZ Units would be available for occupancy starting on August 1, 2011. *See* Defs.' Mot., Ex. 9, ECF No. 67-9 (May 12, 2011 Notice of Availability).  DHCD created a list of eligible households or persons interested in purchasing or renting the IZ Units who self-certified their eligibility to participate in the IZ Program.  Pl.'s Stmt. ¶¶ 44-45.  Using these lists, the District subsequently went through a process of running "lotteries" and other alternative selection procedures to identify possible buyers for the units.  *Id.* ¶¶ 47-56.

However, for reasons the parties dispute, the effort to locate a buyer for the units was unsuccessful for an extended period of time.  Plaintiff contends that this failure was the fault of Defendants.  Predominantly, Plaintiff claims that a requirement in the IZ Covenant that the affordability restrictions on the IZ Units were to survive any foreclosure on the property prevented would-be purchasers from using HUD-insured mortgages.  *Id.* ¶¶ 67-72.  The record

shows that the District, as well as Plaintiff, was aware that there was a possibility that this aspect of the IZ Covenant could make it difficult for participants in the IZ Program to acquire their preferred form of financing to purchase IZ Units, but chose to make the affordability restrictions survive foreclosure regardless.  Pl.'s Mot., Ex. 15, ECF No. 68-17 (March 2011 e-mail indicating that in 2008 or 2009 DHCD had been sent a letter explaining HUD's policy on deed restrictions); Pl.'s Mot., Ex. 29, ECF No. 68-31 (May 10, 2010 e-mail from Plaintiff's manager Art Linde to DHCD employee Anna Shapiro stating that "the covenant may be a barrier to purchaser mortgage financing . . . we will have to wait and see how the mortgage markets react").  After gaining experience implementing the IZ Program, the District revised the IZ Covenant in 2012 to change this feature.  Pl.'s Stmt. ¶¶ 71, 75.  Plaintiff also implicates in the delay selling the IZ Units Defendants' failure to timely create lists of eligible buyers, understaffing, and various other alleged "blunders" in the implementation of the IZ Program.  At multiple times throughout this period, Plaintiff requested that DHCD release it from having to comply with the IZ Program, but DHCD declined to do so.  Pl.'s Stmt. ¶¶ 60, 63, 76; *see also, e.g.*, Defs.' Mot., Ex. 10, ECF No. 67-10.

For their part, Defendants contend that Plaintiff's lack of cooperation with efforts to market and sell the property is to blame.  Defendants argue that Plaintiff was more interested in using the failure of these units to sell as evidence in its battle to dismantle the IZ Program than in actually selling the units.  As evidence, Defendants cite that Plaintiff refused to advertise the units at all, turned down at least one potential buyer, and at one point labelled the IZ Units as "sold" on its website.  Defs.' Mot., Ex. 19, ECF No. 67-19 (2910 Georgia Ave. webpage listing units as sold in April 2013).

Having carefully reviewed the evidence in the record, the Court concludes that both parties share some part of the blame for the time it took to sell Plaintiff's units. But who is more or less at fault for the delay is not dispositive of Plaintiff's constitutional claims at this stage. Far more important is the fact that during this period Plaintiff was able to, and did, make unrestricted and quite profitable use of the vast majority of Plaintiff's development. The twenty units not affected by the IZ regulations in Plaintiff's building were sold at market rates between $225,000 and $404,000, for a total of over $6 million. Pl.'s Stmt. ¶ 57; Defs.' Stmt. ¶ 61. This earned the investors in Plaintiff's condominium building a 20% return on their investments. Defs.' Stmt. ¶¶ 62, 63; Defs.' Mot., Ex. 25, ECF No. 67-25 (December 23, 2011 Letter from Art Linde to the investors in 2910 Georgia Ave).

Plaintiff has now also sold its IZ Units. IZ Unit C-02 was sold on April 8, 2015 for $145,200, although Plaintiff strenuously disputes whether the buyer, Ms. Ragini Patel, was in fact eligible to participate in the IZ Program. Pl.'s Stmt. ¶ 105; Defs.' Mot., Ex. 27, ECF No. 67-27 (Deed for Unit C-02). IZ Unit 2-02 was recently sold for $271,200. Pl.'s Stmt. ¶ 130; Defs.' Stmt. ¶ 16; Defs.' Reply, Ex. 1, ECF No. 72-1 (Deed for Unit 2-02).

## D. Procedural History

The parties' relationship predictably grew sour amid these extended efforts to sell Plaintiff's IZ Units, leading Plaintiff to file its first complaint in this case on December 13, 2012. Compl. for Monetary and Declaratory Relief, ECF No. 1. On February 11, 2013, Defendant District of Columbia moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim. Mot. to Dismiss Compl., ECF No. 12. The Court granted-in-part and denied-in-part Defendant's motion. *See 2910 Georgia Ave. LLC v. D.C.*, 983 F. Supp. 2d 127 (D.D.C. 2013). With respect to the Court's subject matter jurisdiction, the Court concluded that

"Plaintiff's takings claim with respect to the set-aside requirement itself is not ripe," because Plaintiff had not sought relief from that requirement from the D.C. Board of Zoning Adjustments, and that it accordingly "lack[ed] subject matter jurisdiction over the Plaintiff's challenge to the IZ Program writ large." *Id.* at 136.  However, the Court concluded that it could still "consider the Plaintiff's challenge to the inclusionary zoning covenant restricting the sale of the units in question." [4] *Id.*  The Court also concluded that it had subject matter jurisdiction over Plaintiff's due process and equal protection claims.  *Id.* at 134.  Finally, the Court found that "Plaintiff has sufficiently alleged a total taking of its property."  *Id.*

Discovery closed in this matter on May 7, 2015.  However, on December 29, 2015, the Court granted Plaintiff's motions to reopen discovery and for leave to file an amended complaint.  Mem. Op. & Order (Dec. 29, 2015), ECF No. 57.  Plaintiff sought permission to engage in limited additional discovery regarding the sale of Unit C-02 to Ms. Patel, which had only recently occurred at that point, and sought to amend its complaint to add a procedural due process claim.  *Id.* at 7.  The Court granted the motion to amend, noting, among other things, that the new procedural due process claim was not futile for the reasons argued by Defendants.  *Id.* at 17.  The Court also granted the motion to reopen discovery because it found that "the facts newly discovered by Plaintiff shortly before the filing of Plaintiff's motion to reopen discovery raise questions regarding Ms. Patel's eligibility to purchase Unit C-02 and regarding the process by which the District approved Ms. Patel's application."  *Id.* at 12.

---

[4] On April 9, 2014, the Court denied Defendants' Motion for Reconsideration of the Court's holding that Plaintiff's challenge to the IZ Covenant was ripe.  Order (April 9, 2014), ECF No. 31; Mem. Op. (April 9, 2014), ECF No. 32.

Plaintiff's Amended Complaint was deemed filed as of December 29, 2015.  Count I of the Amended Complaint alleges a claim under the Takings Clause of the Fifth Amendment pursuant to 42 U.S.C. § 1983.  Amend. Compl. for Monetary and Declaratory Relief, ECF No. 58, ¶¶ 80-95.  Count II alleges that the way in which the District implemented and administered the IZ Program violated Plaintiff's substantive due process and equal protection rights in violation of the Fifth Amendment.  *Id.* ¶¶ 96-100.  Count III alleges that the way in which the District implemented and administered the IZ Program violated Plaintiff's procedural due process rights in violation of the Fifth Amendment.  *Id.* ¶¶ 101-07.  Finally, Count IV seeks a declaratory judgment that the IZ Program is unconstitutional, that the Defendants, acting under color of state law, deprived the Plaintiff of rights guaranteed by the United States Constitution, and that the Plaintiff is entitled to compensation.  *Id.* ¶¶ 108-11.

After the filing of Plaintiff's Amended Complaint, the parties filed and briefed cross-motions for summary judgment.  These motions are now ripe for resolution.

## II.  LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The mere existence of *some* factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact.  *Id.*  Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.  *Id.*

13

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in its favor.  *Liberty Lobby*, 477 U.S. at 255.  If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate.  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251-52.  In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

14

### III. DISCUSSION

At its core, this case is about Plaintiff's complaint that it "bore the brunt of the District's 'growing pains' as it fumbled and bungled every aspect of the IZ Program's implementation." Pl.'s Mot. at 4. This may be so, but the facts in the record are simply insufficient to establish the constitutional violations alleged. For the reasons discussed below, Plaintiff has not established (A) an unconstitutional taking, (B) a violation of the Equal Protection Clause, (C) a violation of Plaintiff's substantive due process rights, or (D) a violation of its procedural due process rights. Accordingly, Defendants are entitled to summary judgment on each of Plaintiff's claims.

#### A. Plaintiff's Takings Claim

"The Takings Clause of the Fifth Amendment prohibits the government from taking 'private property . . . for public use, without just compensation." *Dist. Intown Properties Ltd. P'ship v. D.C.*, 198 F.3d 874, 878 (D.C. Cir. 1999) (quoting U.S. Const. amend. V). Two types of takings are prohibited by this clause: "takings without just compensation and takings for a private purpose." *Rumber v. D.C.*, 487 F.3d 941, 943 (D.C. Cir. 2007). Plaintiff alleges that both prohibited types of takings have occurred here.

For the reasons set forth below, Defendants are entitled to summary judgment on Plaintiff's takings claim. The Court begins its analysis of this claim, as it must, by (1) determining the relevant parcel of property at issue. The Court concludes that the relevant parcel is the 22-unit condominium building for which Plaintiff sought a building permit from the District. The Court then (2) explains why the regulations at issue, which affected the use of only 8-10% of that building, did not constitute either a permanent or temporary regulatory taking. Next, the Court (3) explains why the various alternate takings frameworks that Plaintiff has

suggested could apply to this case are inapposite.  Finally, the Court (4) concludes that Plaintiff

has not presented evidence necessary to establish an unconstitutional private taking.

### 1.  The Relevant Parcel of Property

Before the Court can consider whether the regulations at issue constituted a taking of

Plaintiff's property, the Court "must first define what constitutes the relevant parcel."  *Dist.*

*Intown*, 198 F.3d at 879.  Defendants contend that the relevant parcel in this case is "the 22-unit

development as a whole" for which Plaintiff sought a building permit.  Defs.' Mot. at 7.

Plaintiff, on the other hand, contends that "the relevant parcels are the individual condominium

units subject to the IZ Program and the IZ Covenant."  Pl.'s Opp'n at 10.

The Court previously addressed this issue in its 2013 Memorandum Opinion on the

District's Motion to Dismiss, wherein the Court noted that this constituted the "fundamental

dispute between the parties."  *2910 Georgia Ave.*, 983 F. Supp. 2d at 137.  It remains a

fundamental dispute between the parties now, and its resolution has profound implications for

the legal sufficiency of Plaintiff's takings claim.  *See Dist. Intown*, 198 F.3d at 879 ("[t]he

definition of the relevant parcel profoundly influences the outcome of [the] takings analysis.").

As the Court stated in its earlier Opinion, "[u]ltimately the relevant 'property' for purposes of

this case is a fact-intensive inquiry."  *2910 Georgia Ave.*, 983 F. Supp. 2d at 137.  This fact-

intensive inquiry includes consideration of at least the following factors: "the degree of

contiguity, the dates of acquisition, the extent to which the parcel has been treated as a single

unit, and the extent to which the restricted lots benefit the unregulated lot."  *Dist. Intown*, 198

F.3d at 880.  "[A] court must [ ] consider how both the property-owner and the government treat

(and have treated) the property." *Id.*  "Above all, the parcel should be functionally coherent."
*Id.*

The leading case applying these factors in the D.C. Circuit is *District Intown Properties*
*Ltd. Partnership v. District of Columbia*.  In that case, plaintiff District Intown had purchased an
apartment building and landscaped lawn across from the National Zoo in 1961.  *Id.* at 876.  In
1988, District Intown subdivided that property into nine lots.  *Id.* at 877.  In 1992, the Mayor of
the District of Columbia denied District Intown's request for construction permits to build
townhouses on eight of those nine lots, based on the lots' status as historic landmarks.  *Id.* at
877-78.  Plaintiff sued, alleging that this constituted a violation of the Takings Clause.  *Id.*  The
District Court granted summary judgment for Defendant District of Columbia and the Court of
Appeals affirmed.  *Id.* at 876-77.

As relevant here, the question the Court of Appeals considered was: "Does
the relevant parcel consist of the property as a whole or do the eight lots for which construction
permits were denied constitute the relevant parcels?"  *Id.* at 879.  The Court of Appeals held that
the relevant parcel was the property as a whole.  The court reasoned that "[t]he lots are spatially
and functionally contiguous," "District Intown purchased the property as a whole" and treated it
as a single property before subdivision, and that there was no evidence that District Intown
treated the lots separately for the purposes of accounting or management.  *Id.* at 880.  Although
there are certain factual distinctions between this case and *District Intown*, the Court finds that
application of the *District Intown* court's reasoning to the undisputed facts in this case demands
the conclusion that the relevant parcel is the entire 22-unit condominium building which Plaintiff
sought a permit to build.

As an initial matter, the Court notes that when addressing this issue in its earlier Opinion, in the context of the District of Columbia's motion to dismiss the complaint, the Court stated that the fact that "District of Columbia law provides that '[e]ach condominium unit shall constitute for all purposes a separate parcel of real estate, distinct from all other condominium units'" supported Plaintiff's argument that the relevant parcel could be the individual condominium units. *2910 Georgia Ave.*, 983 F. Supp. 2d at 137 (quoting D.C. Code § 42-1901.03). The Court reaffirms here that D.C. law is a relevant factor in determining what constitutes the relevant parcel, and that in this case this factor tends to support Plaintiff's position. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1016 n.7 (1992) ("The answer to this difficult question may lie in how the owner's reasonable expectations have been shaped by the State's law of property"). However, the Court of Appeals in *District Intown* expressly instructed that local law "is not always determinative" of the relevant parcel question, 198 F.3d at 879, and the Court rejects Plaintiff's suggestion that the Court's earlier statement should be conclusive of the Court's decision regarding the relevant parcel at this stage in the litigation. The Court did not make any final determination in its preliminary Opinion as to what the relevant parcel would be. Instead, the Court's statement regarding D.C. law was made in the context of its holding that, having reviewed the complaint "for purposes of a motion to dismiss, the Plaintiff has sufficiently *alleged* that the IZ program constitutes a total taking." *2910 Georgia Ave.*, 983 F. Supp. 2d at 137 (emphasis added). Now, for purposes of the parties' cross-motions for summary judgment, the Court has conducted a fact-intensive analysis of all the relevant factors and has considered not just the allegations in Plaintiff's complaint, but the factual record as a whole. Having conducted such an analysis, the Court concludes that despite the referenced D.C. law, the *District Intown* factors demand the conclusion that the relevant parcel is the entire 22-unit condominium

building, not only the individual units within that building that were affected by the challenged regulations.

First, all of the condominium units within the building are contiguous.  They are all units within a single building on a single parcel of land.  *See* Defs.' Mot., Ex. 8, ECF No. 67-8 (Plat and Plans of Condominium Subdivision for 2910 Georgia Avenue); *see also Contiguous*, BLACK'S LAW DICTIONARY (9th ed. 2009) ("[t]ouching at a point or along a boundary").  The Court does not find persuasive Plaintiff's contention that the individual condominium units in this case are not contiguous because they are "on different floors" or otherwise "physically separated from" each other.  Pl.'s Opp'n at 11-12.  Despite the fact that the units are separated from each other to the same extent units within a condominium building are generally separated (*i.e.*, walls and doors), the Court concludes that the contiguity factor certainly weighs in favor of considering the condominium building as a whole to be the relevant parcel of property.

Second, the date of acquisition also favors this conclusion.  Plaintiff did not acquire the IZ Units at different times than all of the other units within the condominium building.  Plaintiff purchased six lots of land in 2009, combined them into a single parcel, and then built the entire condominium building at one time.  Defs.' Stmt. ¶¶ 23-29.  The building was only subdivided into 22 units at a later date, after acquisition.  *Id.* ¶ 29; *Dist. Intown,* 198 F.3d at 880 (considering entire parcel as a whole because "District Intown purchased the property as a whole in 1961" before later subdividing it).

The third factor, "the extent to which the parcel has been treated as a single unit," also favors concluding that the relevant parcel is the condominium building as a whole.  Plaintiff argues that this factor weighs in favor of considering the two IZ Units separately because Plaintiff subdivided the building and sold the units within it, including the IZ Units, individually

to separate buyers and at different times.  Pl.'s Opp'n at 10-12.  Plaintiff elaborates that the units

receive separate utilities, are separately recorded, and are separately taxed and assessed

fees.  *Id.*

      As an initial matter, most, if not all, of the distinct treatment Plaintiff can point to with

respect to the individual condominium units is merely a result of the fact that Plaintiff subdivided

the condominium building after it was constructed.  The Court of Appeals has held that "[t]he

intentional act of subdivision" alone is not sufficient to show that the subdivided units should be

the relevant parcels for takings analysis.  *Dist. Intown,* 198 F.3d at 880.  When the record in this

case is viewed as whole it becomes clear that these aspects of distinct treatment do not tell the

full story, and that in reality the 22-unit condominium building as a whole has consistently been

treated as a single, coherent piece of property.  The building was treated as a single unit for

permitting purposes—this lawsuit arose from Plaintiff's filing of a building permit application to

the District to construct the entire condominium *building*, not any individual units.  *See Norman*

*v. United States*, 429 F.3d 1081, 1091 n.4 (Fed. Cir. 2005) (noting that the fact that "appellants'

own permit application related to the entire 2280–acre parcel, and not to any subdivision thereof"

indicated that the entire parcel should be considered the relevant parcel for the purposes of

appellants' taking claim).  All of the units were also part of a single, common development plan

or project.  *See Forest Properties, Inc. v. United States*, 177 F.3d 1360, 1365 (Fed. Cir. 1999) (a

combination of legally distinct parcels was properly treated as the relevant parcel where "the

development was treated as a single integrated project" and it was understood that the individual

"portions would be developed as a single project").  It is undisputed that the entire building, all

22 units included, was presented as a single investment for financing, planning and building

purposes.  *See* Defs.' Stmt. ¶¶ 23-27; Defs.' Mot., Ex. 6, ECF No. 67-6 (2910 Georgia Avenue

Investment Prospectus describing entire building as a single project for investment); Defs.' Mot.,

Ex. 25 (letter to investors describing the return they received on their investment in the building

as whole).  Only after the IZ Covenant was signed, the permit for the entire *building* was granted,

and the building was completed, did Plaintiff then subdivide the building into separate units.[5]

Despite this history, Plaintiff asks the Court to analyze Plaintiff's takings claim as though

the relevant parcel only includes the units that were affected by the challenged regulations.  But

to do so would allow Plaintiff to unfairly paint a regulation which only regulates the use of a

small portion (8-10%) of Plaintiff's development as a restriction on the development in its

entirety, and therefore potentially a "total" taking.  This is precisely the type of circular logic that

the Supreme Court has rejected because it would lead to every regulation, no matter how

reasonable in scope, constituting "total" and therefore categorical taking.  *See Tahoe-Sierra*

*Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 331 (2002) ("Of course,

defining the property interest taken in terms of the very regulation being challenged is circular"

because "[w]ith property so divided," every potential taking "would constitute [a] categorical

taking[ ]."); *Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Trust for S.*

*California*, 508 U.S. 602, 644 (1993) ("a claimant's parcel of property could not first be divided

into what was taken and what was left for the purpose of demonstrating the taking of the former

---

[5] Plaintiff also suggests that the manner in which the IZ Program itself "view[s]" the property shows that the relevant parcels should be the individual IZ Units.  Pl.'s Opp'n at 12. This argument is meritless.  The fact that the IZ Program is only applicable to developments with ten or more dwelling units, or that the Program restricts the use of the set-aside units but not the remaining units, is not "clearly inconsistent," *id.* at 13, with treating the entire building to which the IZ Program regulations apply as the relevant parcel for Plaintiff's takings claim.  If anything, the fact that the IZ Program applies to 8-10% of "the gross floor area" of developments, D.C. Mun. Regs. tit. 11, § 2603, suggests that the IZ Program "views" the subject of its regulation to be developments as a whole.

to be complete and hence compensable.  To the extent that any portion of property is taken, that portion is always taken in its entirety"); *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 130 (1978) ("'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated."). Accordingly, the Court concludes that the manner in which the property has been treated also weighs in favor of considering the entire condominium building at 2910 Georgia Avenue the "relevant parcel" for the purposes of Plaintiff's takings claim.

Finally, the Court finds that that there is not significant evidence regarding the "extent to which the restricted lots benefit the unregulated lot" that favors either parties' position in this case.  However, the *District Intown* court found that summary judgment on the relevant parcel issue was proper even when a dispute existed as to this final factor where, as here, "the other three factors strongly suggests that [the subdivided lots] are functionally part of the same property."  *Dist. Intown*, 198 F.3d at 880.

The Court concludes by noting that, although Plaintiff is certainly correct that certain "other takings decisions have held that it is appropriate to analyze a regulation's effect on specific parcels or portions of a property that are subject to government imposition," Pl.'s Opp'n at 14, none of those decisions demand the outcome sought by Plaintiff here.  In particular, Plaintiff relies heavily on *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed. Cir. 1994), but the reasoning of that case does not support Plaintiff's position.[6]  In that case, the

---

[6] Nor does the reasoning of *Lost Tree Vill. Corp. v. United States*, 707 F.3d 1286 (Fed. Cir. 2013) support Plaintiff's position.  In that case, the Federal Circuit stated that "even when contiguous land is purchased in a single transaction, the relevant parcel may be a subset of the original purchase where the owner develops distinct parcels at different times and treats the parcels as distinct economic units."  *Id.* at 1293.  This may be true, but as described herein,

Federal Circuit concluded that the relevant parcel for its takings analysis was 12.5 acres out of an original 250-acre parcel. *Id.* at 1181. That conclusion, however, was based on the fact that most of the remaining acres had already been developed and sold before the state attempted to impose the regulatory restrictions at issue. *Id.* Here, by contrast, Plaintiff was required to agree to abide by the IZ regulations in order to obtain a building permit for the entire 22-unit condominium building at the same time, before any of the units were developed. Other acres were not included in the "relevant parcel" in *Loveladies Harbor* because those parcels had already been dedicated to the state. Plaintiff has not dedicated the 20 units it seeks to exclude from the relevant parcel here to the state—it has been left to use them unregulated and has received significant economic benefit from selling them to private parties in the course of its business.[7] Unlike the dedicated acres in *Loveladies Harbor*, the 20 unrestricted units in Plaintiff's building brought Plaintiff economic benefit and it accordingly makes perfect sense to consider them when determining the challenged regulations' overall economic effect on Plaintiff.

In sum, in analyzing whether the regulations at issue constituted a "taking" of Plaintiff's property, the Court views the relevant parcel of property as the condominium building at 2910 Georgia Avenue for which Plaintiff sought a building permit from the District. As will be seen below, this conclusion is largely determinative of Plaintiff's takings claim.

---

Plaintiff treated all of the units at issue in this case as a whole, developing them all at the same time as part of a single project.

[7] The Court additionally notes that even application of the rejected bright line rule proposed by the plaintiff in *Loveladies Harbor*, "that the denominator of the takings fraction is that parcel for which the owner seeks a permit," *Loveladies Harbor*, 28 F.3d at 1181, would result in the relevant parcel in this case being the entire 22-unit condominium building for which Plaintiff sought a building permit.

### 2.  Plaintiff's Regulatory Takings Claim

"In a regulatory takings case," such as this one, "the principal focus of inquiry is whether a regulation 'reaches a certain magnitude' in depriving an owner of the use of property."  *Dist. Intown*, 198 F.3d at 878 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)). "The Supreme Court has indicated that most regulatory takings cases should be considered on an ad hoc basis, with three primary factors weighing in the balance: the regulation's economic impact on the claimant, the regulation's interference with the claimant's reasonable investment-backed expectations, and the character of the government action."  *Id.* at 878-79 (citing *Penn Central*, 438 U.S. at 124).  "As the 'party challenging governmental action as an unconstitutional taking,' [Plaintiff] bears a 'substantial burden.'"  *Id.* at 878 (quoting *Eastern Enterprises v. Apfel*, 524 U.S. 498, 523 (1998)).

Plaintiff has not satisfied its burden in this case.  First, and most importantly in this particular case, the economic impact of the regulation at issue on Plaintiff weighs strongly against finding a taking in this case.  Under this factor, Plaintiff must demonstrate that the relevant parcel of property "no longer provide[s] a reasonable rate of return" in light of the challenged regulation.  *Id.* at 884.  "[A] claimant must put forth *striking evidence* of economic effects to prevail even under the *ad hoc* inquiry."  *Id.* at 883 (emphasis added).  Indeed, in *Penn Central*, the Supreme Court found that no taking had occurred despite the fact that the regulation at issue caused a diminution in value of 75%.  *Penn Central*, 438 U.S. at 131.

Here, only two of the 22 units in Plaintiff's development were subject to an IZ Covenant restricting their use at all.  Although Plaintiff complains that the IZ Program delayed the sale of these units and affected the profit Plaintiff sought to receive from them, the regulations certainly did not leave Plaintiff without a reasonable rate of return from its development as a whole.  Quite

24

the opposite: Plaintiff sold the unrestricted units in its development for over $6 million, earning

the investors in Plaintiff's building a 20% return on their investments.  Defs.' Stmt. ¶¶ 62, 63;

Defs.' Mot., Ex. 25 (letter to investors in 2910 Georgia Ave. stating that they had received a 20%

return on their investment in the development even before the two IZ Units were sold).[8]  Far

from the "striking evidence" of economic impact required, *Dist. Intown*, 198 F.3d at 883, the

evidence shows that the regulations at issue—albeit perhaps a source of justifiable frustration for

Plaintiff—did not prevent Plaintiff from earning a considerable profit from its property.

The other *Penn Central* factors do not salvage Plaintiff's claim.  First, Plaintiff's

investment backed expectations do not support finding a taking.  "A reasonable investment-

backed expectation 'must be more than a unilateral expectation or an abstract need.'"  *Id.* at 879

(quoting *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005-06 (internal quotations omitted)).

"Claimants cannot establish a takings claim 'simply by showing that they have been denied the

ability to exploit a property interest that they heretofore had believed was available for

development.'"  *Id.* (quoting *Penn Central*, 438 U.S. at 130).  Instead, "a buyer's reasonable

expectations must be put in the context of the underlying regulatory regime."  *Id.* at 883.

Here, Plaintiff did not have a "reasonable" investment-backed expectation of selling its

condominium units free from IZ Covenants.  Plaintiff's argument that it did have such a

reasonable expectation is apparently based on its claim that the IZ Program was sprung on

---

[8] Although this alone would suffice to show that the economic effect of the regulation
was insufficient to constitute a regulatory taking, the Court additionally notes that the IZ Units
themselves also eventually sold, providing Plaintiff with an additional $416,400 of revenue from
its property.  Pl.'s Stmt. ¶¶ 105, 130; Defs.' Stmt. ¶ 16.  In light of the considerable amount of
revenue Plaintiff's property generated, as discussed herein, the Court need not resolve the
parties' dispute regarding whether Plaintiff could have generated even more revenue by renting
its property.

Plaintiff unfairly, becoming effective immediately on December 11, 2009 without a promised

phase-in period.  However, the Court has already determined that the IZ Program—at least as

relevant to Plaintiff's project and claims—took effect on August 14, 2009, three months prior to

Plaintiff's purchase of the property at 2910 Georgia Avenue and after a phase-in period.  *See*

*Full Value Advisors, LLC v. S.E.C.*, 633 F.3d 1101, 1110 (D.C. Cir. 2011) (holding that plaintiff

did not have a reasonable investment-backed expectation where challenged-requirements were in

effect before acquisition).  Plaintiff may genuinely not have been aware that these new

regulations had taken effect, but the fact that Plaintiff did not keep abreast of building

regulations, and accordingly subjectively believed that it could build its development without

being subject to the IZ Program, does not make its investment-backed expectation *reasonable*.

Plaintiff was apparently relying on its architect to keep updated on those laws, Defs.' Stmt. ¶ 42,

which he apparently did not do, despite declaring that he was aware that the IZ Program "had

been under discussion within the District government at that point for four or five years."  Defs.'

Mot., Ex. 11, ECF No. 67-11 (June 26, 2015 Declaration of Eric Colbert) at ¶ 11.  Finally, the

fact that the D.C. Zoning Office employee in charge of Plaintiff's application initially mistakenly

failed to require IZ Program compliance does not make Plaintiff's own belief reasonable that it

could develop its project without complying with a law that was undisputedly in effect at the

time and applicable to Plaintiff's development.

  Finally, the character of the government action in this case does not support a finding that

a "taking" has occurred.[9]  "To assess the character of the government's action, the central

---

   [9] Contrary to Plaintiff's insinuation, the Supreme Court in *Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005), did not hold that the character of the government action is not a relevant
consideration in the Court's taking analysis, and Defendants were correct to address it as one of
the three *Penn Central* factors.  *Id.* at 545 ("our holding today-that the 'substantially advances'

question is whether the regulation advances a 'common good' or 'public purpose.'" *George Washington Univ. v. D.C.*, 391 F. Supp. 2d 109, 113-14 (D.D.C. 2005) (citing *Dist. Intown Properties Ltd. P'ship v. D.C.*, 23 F. Supp. 2d 30, 37 (D.D.C. 1998)).  Here, the Court has already answered this question in the affirmative in its 2013 Memorandum Opinion: the IZ Program serves a public purpose.  *2910 Georgia Ave.*, 983 F. Supp. 2d at 135.  The Court reaffirms that conclusion now.

Plaintiff's arguments regarding this factor are not persuasive.  First, Plaintiff argues that the character of the government action in this case favors finding that a taking has occurred because the IZ Program has been a "failure."  Pl.'s Opp'n at 16.  In support of this claim, Plaintiff argues that other programs have produced more affordable housing than the IZ Program. *Id.* at 16-17.  This line of attack misinterprets the Court's role in analyzing the character of the government action.  The character of the government action weighs against finding a taking if the action is "a general regulation with a legitimate public purpose."  *Dist. Intown*, 198 F.3d at 883.  The Court takes a "deferential stance regarding what constitutes a legitimate public purpose."  *Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208, 245 (D.D.C. 2014).  Given that the program at issue here serves a public purpose, it is not the role of the Court, other than perhaps in extreme circumstances not present here, to sit in judgment of the *efficacy* of this program as compared to others.

Second, Plaintiff argues that the character of the government action is "very much call[ed] into question" by the eventual sale of one of Plaintiff's IZ Units to an individual, Ms. Ragini Patel, who Plaintiff now claims is not eligible to participate in the IZ Program.  Pl.'s

---

formula is not a valid takings test-does not require us to disturb any of our prior holdings").

Reply at 13.  The Court addresses this issue further below in section III.A.4 of this Memorandum

Opinion, but for now it is sufficient to say that Plaintiff's evidence in this regard does not show

that Defendants acted with any non-public purpose when administering the IZ Program with

respect to Plaintiff and this purchaser.  At most, Plaintiff raises questions about whether District

employees made mistakes while administering the program and whether Ms. Patel may have

falsely represented her wealth, income or intentions in her application to participate in the

program.  These question do not change the fact that the character of the government action

challenged here is a generally applicable regulation intended to serve a public purpose.[10]  At the

very least, they certainly do not constitute a powerful enough showing as to the character of the

government action factor to overcome the Court's conclusion that the other two *Penn Central*

factors weigh strongly in favor of finding that no taking has occurred.  *See Perry Capital*, 70 F.

Supp. 3d at 244 ("A [party] is not required to demonstrate favorable results under all three *Penn*

*Central* factors . . . it is a balancing test.").

    In sum, the challenged regulation, which affected how Plaintiff could use 8-10% of its

development, is a generally applicable regulation with a legitimate purpose.  It did not interfere

with any reasonable investment-backed expectations of Plaintiff's, nor create a sufficiently

severe economic effect on Plaintiff, to rise to the level of an unconstitutional regulatory taking.

    The above analysis also resolves Plaintiff's "temporary takings" claim.  At no point, even

prior to the sale of the two IZ Units, did the IZ Program regulations at issue affect Plaintiff's

development in such a way as to work a taking.  Plaintiff argues that, "at an irreducible

---

[10] The Court further notes that Plaintiff's allegations are irrelevant to the character of the
government action with regard to the initial imposition of the IZ Covenant or the effect the
covenant had on the delayed sale of Plaintiff's units leading up to their eventual sale, given that
the sale to Ms. Patel had not even occurred yet at those times.

minimum" Defendants' actions constitute a "temporary taking" because of the delay in selling the IZ Units. Pl.'s Mot. at 27-28. But this argument is misguided in its assumption that temporary takings are "different in kind from permanent takings." *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty., Cal.*, 482 U.S. 304, 318 (1987). They are not different. *Id.* Temporary takings "should be analyzed in the same constitutional framework applied to permanent irreversible takings." *Yuba Nat. Res., Inc. v. United States*, 821 F.2d 638, 641 (Fed. Cir. 1987). With respect to Plaintiff's reasonable investment-backed expectations and the character of the government action, the Court's analysis is the same for Plaintiff's temporary takings claim as it was for Plaintiff's permanent takings claim, which is described above.

With respect to the economic effect of the regulation, which was arguably temporarily more severe before the IZ Units eventually sold, the effect was still far from sufficient to support a regulatory takings claim. "[I]n a temporary regulatory takings analysis context the impact on the value of the property as a whole is an important consideration, just as it is in the context of a permanent regulatory taking." *Cienega Gardens v. United States*, 503 F.3d 1266, 1281 (Fed. Cir. 2007). As discussed above, viewing the property as a whole, it is clear that the regulations at issue did not work a taking of Plaintiff's condominium building, despite the time it took to find buyers for two of the units therein. Even before these units were sold, the degree of economic impact the regulations had on Plaintiff's rate of return with respect to the condominium building as a whole was far from sufficient to establish a taking. Plaintiff was able to sell units making up 90% of its building for over $6 million, earning a significant profit and a healthy return for its investors. Although Plaintiff complains that it was required to pay real estate taxes and other "carrying costs" on the IZ Units before they sold, there is "no evidence that

this regulation rendered [Plaintiff's condominium building] unprofitable to maintain." *Dist.*

*Intown*, 198 F.3d at 883.

For all of the reasons explained above, Defendants are entitled to summary judgment on

Plaintiff's permanent and temporary regulatory takings claim.

### 3. Plaintiff's Proposed Alternative Takings Frameworks

In an attempt to escape application of the *Penn Central* factors, Plaintiff posits numerous

alternative takings frameworks it believes this Court should apply to its takings claim.  None of

those frameworks apply.  As an initial matter, Plaintiff's claim does not fit into any of the narrow

categories of categorical or *per se* takings.  Although the Supreme Court has held that most

takings claims should be analyzed on the ad hoc basis set forth above, it has also "indicated that

it will find a 'categorical' or per se taking in two circumstances."  *Dist. Intown*, 198 F.3d at

879.  "The first circumstance includes regulations that result in 'permanent physical occupation

of property.'"  *Id.* (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434-

35 (1982)).  "The second circumstance includes regulations pursuant to which the government

denies all economically beneficial or productive use of property."  *Id.* (quoting *Lucas*, 505 U.S.

at 1015).  Plaintiff argues that either or both of these circumstances are present here.

First, for the same reasons set forth above in the Court's *Penn Central* analysis, Plaintiff

is incorrect that the regulations at issue denied it "*all* economically beneficial or productive use

of" its property.  *Id.* (emphasis added).  To constitute this type of categorical taking, "a claimant

must show that its property is rendered 'valueless' by a regulation."  *Id.* at 882; *see also Lucas*,

505 U.S. at 1019 n.8 (noting that categorical taking would not occur where landowner's property

was diminished in value by regulation by only 95%).

30

Here, Plaintiff was plainly not denied *all* economically beneficial use of its property. Plaintiff was required to execute IZ Covenants for 8-10% of the condominium building at issue. D.C. Mun. Regs. tit. 11, § 2603.   Plaintiff was free to, and did, use the remaining 90-92% of the building not subject to IZ Covenants, earning over $6 million and a significant profit.  Defs.' Stmt. ¶¶ 29, 61.  Accordingly, because Plaintiff has not shown that it was denied all economically beneficial use of its property, its first categorical taking claim fails.[11]

The Court pauses here to address the argument Plaintiff makes at various points throughout its summary judgment briefing that there has also been a categorical taking of Plaintiff's alleged "property right" to the bonus density allowed for under the IZ Program.  *See, e.g.*, Pl.'s Mot. at 10, 20.  This argument does not have merit because Defendants did nothing to "take" this supposed right from Plaintiff.  Plaintiff's argument on this point is premised on its claim that it was "realistically" unable to take advantage of the bonus density because the IZ Program regulations became effective immediately on December 11, 2009, with no phase-in period.  As the Court has already discussed above, this assertion is wrong.  The IZ Program became effective on August 14, 2009, after a phase-in period.  Even if certain amendments were subsequently made to the program, the basic requirements of the program were effective and applicable before Plaintiff purchased the property at issue.  It is also worth noting that Mr. Linde, Plaintiff's manager, was aware of bonus density in the IZ laws as early as October of 2009, a

---

[11] In fact, the Court notes that even if the relevant parcel of property for purposes of Plaintiff's takings claim consisted only of the units Plaintiff set aside for affordable housing use, Plaintiff could still not establish that it was denied *all* economically viable use of the property. Those units sold for a combined price of $416,400.  Although Plaintiff argues that it is "self-evident" that these units were rendered "valueless" because Plaintiff did not receive its "commercially expected profit," Pl.'s Opp'n at 19, this analysis misinterprets *Lucas*.  Failure to receive an expected profit is not the same thing as rendering property "valueless."

month before Plaintiff even purchased the property at issue.  Pl.'s Opp'n, Ex. 88, ECF No. 70-3

(May 6, 2015 Deposition of Arthur Linde), at 40:12-20 ("Q: So you were aware October 29th,

2009, of the bonus density in the inclusionary zoning laws? A: Apparently, I was. Yes."); Defs.'

Mot., Ex. 13, ECF No. 67-13, at 2 (October 29, 2009 e-mail from Art Linde to Paul Adresino *et

al.*) ("Of some use may be the bonus density we are afforded via the Inclusionary Zoning laws").

Plaintiff cannot, accordingly, claim that Defendants "took" its right to bonus density.

Second, relying on the Supreme Court's opinion in *Loretto v. Teleprompter Manhattan

CATV Corp.*, Plaintiff unsuccessfully attempts to shoehorn the facts of this case into a categorical

taking by arguing that "[t]he Court could properly view the IZ Program, as applied to this

Plaintiff, as an actual physical invasion or usurpation of property rights."  Pl.'s Mot. at 15.

"[R]egulations that compel the property owner to suffer a physical 'invasion' of his property" are

"compensable without case-specific inquiry into the public interest advanced in support of the

restraint." *Lucas*, 505 U.S. at 1015.  Compensation is required "no matter how minute the

intrusion, and no matter how weighty the public purpose behind it." *Id.*  In *Loretto* the Supreme

Court held that a New York law that required landlords to "permit a cable television company to

install its cable facilities upon his property," such that "the cable installation occupied portions of

appellant's roof and the side of her building," was a taking because it constituted a "physical

occupation of property." *Loretto*, 458 U.S. at 421.  The Court stated that "when [a] physical

intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred."

*Id.* at 426.

Similarly, as Plaintiff notes, the Supreme Court has also recently reiterated that a *per se*

taking occurs when "'the government directly appropriates private property for its own use.'"

*Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2425-26 (2015) (quoting *Tahoe-Sierra,* 535 U.S. at

324).  The Supreme Court in *Horne* held that a reserve requirement set by the government's

Raisin Administrative Committee, whereby raisin growers were required to "give a percentage of

their crop to the Government, free of charge," constituted a categorical or *per se* taking.  *Id.* at

2424.  This holding was based on the fact that under the program "[a]ctual raisins [were]

transferred from the growers to the Government.  Title to the raisins passe[d] to the Raisin

Committee."  *Id.* at 2428.  Under these circumstances, the Court held that "a clear physical

taking" had occurred.  *Id.*

   These forms of categorical taking are plainly not applicable to the facts of this case.  The

regulations at issue in this case regulate the terms upon which Plaintiff can use (in this case, sell)

its property, generally by limiting the maximum price Plaintiff can charge for that property.  The

District does not take title to Plaintiff's property, nor does it compel Plaintiff to suffer any

physical invasion of its property—points that Plaintiff concedes.  Pl.'s Reply at 8; *see also* Defs.'

Mot., Ex. 3, ECF No. 67-3, at 5 (Plaintiff's response to Defendants' ninth request for admission,

stating that "Plaintiff admits that the IZ Laws and IZ Program have not resulted in a permanent

physical occupation of Plaintiff's property").  In asking the Court to find a categorical taking

under this line of cases regardless, Plaintiff seeks to downplay these distinctions as unimportant.

They are not.  The Supreme Court has "stressed the 'longstanding distinction' between

government acquisitions of property and regulations."  *Horne*, 135 S. Ct. at 2427 (quoting

*Tahoe-Sierra*, 535 U.S. at 323); *see also George Washington Univ.*, 391 F. Supp. 2d at 112

(order prohibiting George Washington University from using its property for any purposes other

than as residences did "not result in a physical occupation of property," but instead simply

"require[d] the University to use its property for a certain purpose").  To the extent that the

regulations in this case might "go[ ] too far" and constitute a taking, *Mahon*, 260 U.S. at 415,

they must be analyzed on the ad hoc basis set forth in *Penn Central* and applied above, *see Yee v. City of Escondido, Cal.*, 503 U.S. 519, 529 (1992) ("When a landowner decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge . . . or require the landowner to accept tenants he does not like . . . without automatically having to pay compensation. . . . Such forms of regulation are analyzed by engaging in the 'essentially ad hoc, factual inquiries' necessary to determine whether a regulatory taking has occurred") (internal citations omitted).

Finally, Plaintiff is also incorrect in suggesting that "an alternative framework through which the Court may consider Plaintiff's claim for uncompensated taking is that Defendants' actions also amount to an imposition of unconstitutional conditions on the development of Plaintiff's land." Pl.'s Mot. at 25. For this argument, Plaintiff relies on *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994). In those cases, the Supreme Court "held that a unit of government may not condition the approval of a land-use permit on the owner's relinquishment of a portion of his property unless there is a 'nexus' and 'rough proportionality' between the government's demand and the effects of the proposed land use." *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2591 (2013). Plaintiff argues that the IZ Program is "essentially the same thing" as the forced exactions of property analyzed in *Nollan* and *Dolan*. Pl.'s Opp'n at 4.

Plaintiff is again incorrect. Unlike in *Nollan* and *Dolan*, the Plaintiff in this case was not required to relinquish any portion of its property to the public in return for a building permit. As discussed above, the IZ Program regulations at issue are generally applicable regulations on how developers may use their property. Pursuant to these regulations, Plaintiff must use a portion of

its real estate development for affordable housing, selling it at certain maximum prices.  The *Nollan* and *Dolan* exaction framework accordingly does not apply here.

In this regard, the Court finds persuasive the recent opinion of the Supreme Court of California, in which that Court analyzed whether a similar inclusionary zoning program implemented in San Jose, California constituted an unconstitutional exaction.  *California Bldg. Indus. Ass'n. v. City of San Jose*, 61 Cal. 4th 435 (2015), *cert. denied*, 136 S. Ct. 928 (2016).  Similar to—although apparently more demanding than—the IZ Program at issue in this case, the ordinance at issue in *California Bldg. Indus.* required that "15 percent of the proposed on-site for-sale units in [a new] development shall be made available at an 'affordable housing cost' to households earning no more than 120 percent of the area median income for Santa Clara County adjusted for household size."  *Id.* at 449-50.  Like Plaintiff here, the plaintiff in *California Bldg. Indus.* argued that the "[o]rdinance violate[d] the unconstitutional conditions doctrine, as applied to development exactions."  *Id.* at 457.  The Supreme Court of California disagreed, explaining that "there can be no valid unconstitutional-conditions takings claim without a government exaction of property, and the ordinance in the present case does not effect an exaction."  *Id.*  That court concluded that "[i]t is the governmental requirement that the property owner convey some identifiable property interest that constitutes a so-called 'exaction' under the takings clause and that brings the unconstitutional conditions doctrine into play."  *Id.* at 460.  Distinguishing *Nollan* and *Dolan*, the California Supreme Court noted that in both of those cases, the Supreme Court had "considered the validity of ad hoc administrative decisions regarding individual land-use permit applications that required a property owner, as a condition of obtaining a sought-after permit, *to dedicate a portion of the property to public use.*"  *Id.* (emphasis in original).  Unlike in those cases, the California Supreme Court noted that the 15% set aside "simply places a

35

restriction on the way the developer may use its property by limiting the price for which the developer may offer some of its units for sale." *Id.* at 461.

The Court finds this analysis persuasive.[12]  The IZ Program is a generally applicable regulation that required Plaintiff, to the same degree as any other developer, to use a certain portion of the units in its new development in a certain manner by regulating the price at which it could sell those units.  It did not require that Plaintiff dedicate any portion of its property to the public in return for granting Plaintiff a building permit.  The unconstitutional exaction framework accordingly does not apply.[13]

In sum, the Court rejects Plaintiff's arguments that this Court could analyze its takings claim under anything other than the ad hoc three factor test set forth by the Supreme Court in *Penn Central*.  Plaintiff cannot demonstrate any type of categorical taking, nor can it demonstrate that the *Nollan-Dolan* unconstitutional conditions framework is applicable to this case.  Because Plaintiff has not established a taking under *Penn Central*, Defendants are entitled to summary judgment.

---

[12] Plaintiff argues that the Court should not rely on *California Bldg. Indus.* because of certain factual distinctions and because the California Supreme Court is an "outlier" that has demonstrated "an historic antipathy toward the property rights of developers that is out of step with" the United States Constitution.  Pl.'s Reply at 9-11.  Plaintiff is, of course, correct that the California Supreme Court's opinion is not binding on this Court, but this Court nonetheless finds that court's reasoning persuasive.  None of Plaintiff's arguments regarding the *California Bldg. Indus.* opinion take away from the fundamental soundness of the California Supreme Court's analysis on the question of whether an inclusionary zoning program constitutes an exaction.

[13] In this section of its briefing, Plaintiff makes references to the fact that the District initially granted and then revoked zoning approval for Plaintiff's development.  Pl.'s Opp'n at 23.  This is irrelevant.  The fact that a District employee initially mistakenly granted zoning approval for Plaintiff's development and then that approval was retracted when the Zoning Office realized that the project was subject to the new IZ regulations does not change the fundamental nature of the regulations at issue.  They are still generally applicable regulations on the use of Plaintiff's property, not exactions.

### 4.  Plaintiff's "Private Taking" Claim

The Court also finds that Defendants are entitled to summary judgment on Plaintiff's "private taking" claim, which is how Plaintiff has styled its argument that Defendants have violated the public use requirement of the Takings Clause.  It is well settled that "[a] taking for a private purpose is unconstitutional even if the government provides just compensation." *Rumber*, 487 F.3d at 944 (citing *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984)); *see also Midkiff*, 467 U.S. at 245 (a taking "executed for no reason other than to confer a private benefit on a particular private party," does "not withstand the scrutiny of the public use requirement").  Plaintiff claims that the public use requirement has been violated in this case because, despite the public purpose of the challenged regulations generally, the individual who eventually purchased one of Plaintiff's IZ Units through the IZ Program did not, as it turns out, satisfy the District's rules for participating in the program.[14]

This argument does not salvage Plaintiff's takings claim.  At the threshold, it fails for the fundamental reason that the Court has already determined that there has been no taking here at all.  The public use requirement becomes relevant only if a taking has occurred.  *See Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1093 (9th Cir. 2015) ("Because we determined that there has been no taking in the first place, it is unnecessary to address whether the public use

---

[14] The Court notes that Plaintiff also at various points in its briefing questions the qualifications of the purchaser of its other IZ Unit, Ms. Tia Watkins.  *See, e.g.*, Pl.'s Mot. at 33 (referring to Ms. Watkins as "questionably qualified").  Plaintiff apparently questioned Ms. Watkins' qualifications to the District during her application process on several grounds, including her grandmother's ownership of a townhouse and the fact that Ms. Watkins entered into the contract and deed for the unit alone, despite her application as a two-member IZ household.  Pl.'s Stmt. ¶¶ 124-30.  The District responded to Plaintiff's concerns explaining how neither issue rendered Ms. Watkins ineligible.  *Id.*  Despite passing references to these facts, Plaintiff does not appear to make any genuine effort to argue that the sale to Ms. Watkins was improper in its briefing on the pending motions for summary judgment.

requirement is met.").  For this reason alone, Plaintiff's extensive arguments about the sale to Ms. Ragini Patel are misguided.

The Court also notes, however, that even if it had found that the IZ regulations at issue constituted a taking, this line of attack would fail for the additional reason that Plaintiff's theory that this "taking" was carried out for a private purpose is not supported by the record.[15] Although Plaintiff has developed an extensive factual record surrounding this argument, it is key to distinguish between facts that have recently come to light that demonstrate that Ms. Patel was not, in fact, an eligible purchaser under IZ Program rules, and facts supporting the quite different assertion that Defendants allowed Ms. Patel to participate in that program for a "private purpose."  With the help of a private investigator, Plaintiff has marshalled colorable evidence of the first issue, apparently indicating that—despite the certifications she made to the District during the application process—Ms. Patel's income and wealth are in fact too substantial to warrant housing assistance, and she has not been using the unit she purchased as her primary residence.

Plaintiff has not, however, presented sufficient evidence on the second issue— Defendants' *purpose* in administering the IZ Program with respect to Ms. Patel.  This is crucial, because "'it is only the taking's *purpose*, and not its mechanics,' . . . that matters in determining public use."  *Kelo*, 545 U.S. at 480 (emphasis added); *Franco v. D.C.*, 456 F. Supp. 2d 35, 40

---

[15] Defendants argue that the Court should not consider Plaintiff's "private taking" claim at all, because Plaintiff did not raise it in its Amended Complaint. Defs.' Opp'n at 2, 38.  The Court will not dismiss this claim for this reason alone.  Plaintiff's Amended Complaint asserts a cause of action under the Takings Clause of the Fifth Amendment of the United States Constitution.  Am. Compl. at 21.  This cause of action is reasonably interpreted as encompassing Plaintiff's "private taking" claim, which is really nothing more than an argument regarding the public use requirement of the Takings Clause.

(D.D.C. 2006) ("a court will not recognize a taking as unconstitutional without evidence that the taking was strictly for a private purpose").  The mere fact that Ms. Patel's participation in the IZ Program may not have objectively furthered the program's overall goal of providing affordable housing to low income individuals is not, *in itself*, sufficient to establish a violation of the public use requirement.  *Kelo*, 545 U.S. at 484 ("it is appropriate for us . . . to resolve the challenges of the individual owners, not on a piecemeal basis, but rather in light of the entire plan.  Because that plan unquestionably serves a public purpose, the takings challenged here satisfy the public use requirement of the Fifth Amendment."); *Rancho de Calistoga*, 800 F.3d at 1092 (rejecting "private as-applied takings" claim that was merely based on claim that "none of the purposes enumerated in [the challenged ordinance] apply here").[16]

Focusing on Defendants' *purpose*, it is clear that Defendants would be entitled to summary judgment on this issue.  The IZ Program's purpose is to "increas[e] the amount and expand[ ] the geographic distribution of adequate, affordable housing available to current and future residents."  D.C. Mun. Regs. tit. 11, § 2600.1.  The Court has already determined—and herein reaffirms—that this is a valid public purpose.  *2910 Georgia Ave.*, 983 F. Supp. 2d at 135.  The Court begins with the premise that the District administered the IZ Program with respect to Ms. Patel in pursuit of this purpose, especially considering that "'[t]here is a presumption that public officers perform their duties correctly, fairly, in good faith, and in accordance with the law

---

[16] *Accord McKenzie v. City of Chicago*, 118 F.3d 552, 558 (7th Cir. 1997) (reversing opinion of district court which had held that eminent domain program of demolishing Chicago buildings did not serve the public interest if the buildings were demolished mistakenly, holding that "of course *mistakes* in the implementation of a program don't serve the public interest, but errors are endemic to human activity.  Surely the judge did not mean that any program that ever errs violates the Constitution.").

and governing regulations . . . .'" *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 795 (Fed. Cir. 1993) (quoting *Parsons v. United States*, 670 F.2d 164, 166 (Ct. Cl. 1982)).

To be sure, the Court's analysis does not end with the IZ Program's stated purpose. Plaintiff could establish a private purpose if it could show that the District acted under the "mere *pretext* of [this] public purpose, when its actual purpose was to bestow a private benefit." *Kelo*, 545 U.S. at 478 (emphasis added). However, despite Plaintiff's intense rhetoric—Plaintiff refers to the District's certification of Ms. Patel as eligible to participate in the IZ Program in turn as "cook[ing] the books," "bogus," "fraudulent" and a "sham," Pl.'s Mot. at 1, 10, 12—there is no evidence to genuinely support such a claim.

In a nutshell, Plaintiff claims that it has demonstrated a private purpose simply because Defendants' projection of Ms. Patel's annual income during the certification process was allegedly so grossly inaccurate that it could not have been made in good faith. As part of determining Ms. Patel's eligibility for the IZ Program in late 2014, Defendants were required to determine Ms. Patel's household's annual income. Defendants projected Ms. Patel's annual income would be $40,882, which was less than the maximum allowable amount for her household size of $42,800.[17]  Pl.'s Mot., Ex. 66, ECF No. 68-70 (Patel Certification of Income, Affordability and Housing Size).  Plaintiff asserts that this conclusion is *in itself* evidence of fraud, cooking the books, or private purpose because the paystubs Ms. Patel submitted to the District indicated that in the earlier part of 2014 she had been earning at a significantly higher rate.  In particular, Ms. Patel had made $45,139.71 between the beginning of 2014 and August

---

[17] Other agents of Defendants apparently reviewed Ms. Patel's paperwork a second time, at which point they projected that her income could be as low as $23,995.  Pl.'s Stmt. ¶ 101.

29 of that year.  Pl.'s Stmt. ¶¶ 95-96; Pl.'s Mot., Ex. 67, ECF No. 68-71 (Patel Earning Statement).

The Court need not make any determination as to the *accuracy* of the District's projection of Ms. Patel's income—indeed, the parties appear to agree that it turned out to be wrong. However, the Court does conclude that the inference of a hidden private purpose or pretext that Plaintiff suggests can be drawn simply based on the District's projection is neither supported nor reasonable.  Plaintiff fails to mention that, despite Ms. Patel's earnings earlier in 2014, every single piece of information that the District was provided by Ms. Patel showed that her income, *by the time they considered her application*, was sufficiently low to qualify her for the IZ Program.

Ms. Patel was an Air Force reservist and her paystubs indicated that she had a highly fluctuating income.  Defs.' Opp'n, Ex. 23, ECF No. 71-23 (Patel paystubs); Defs.' Opp'n, Ex. 13, ECF No. 71-13 (February 3, 2016 Deposition of Ragini Patel) ("I'm not a permanent employee.  So my salary, what it does is it fluctuates.").  Ms. Patel submitted tax returns for the years 2012 and 2013, which indicated that she had made *far* below the maximum allowable income in each of those years.  Defs.' Opp'n, Ex. 15, ECF No. 71-15 (Patel 2012 and 2013 tax returns).  Ms. Patel's 2014 paystubs did indicate that she had made an abnormally large amount earlier in the year, but they also showed a steeply decreasing income throughout that year. Defs.' Opp'n, Ex. 23.  In projecting Ms. Patel's income, the District annualized the amounts on her most recent paystubs, which in addition to being the most current income information provided to the District, were also in line with her earnings in the immediately preceding years. Far from being somehow inappropriate, it is clear that this is *precisely* how HUD encourages parties to project annual income.  Defs.' Opp'n, Ex. 12, ECF No. 71-12 (HUD Handbook

Chapter 5, "Determining Income and Calculating Rent") at 3, 5 (stating that "[t]he owner calculates projected annual income by annualizing *current* income" and, especially in "challenging situations" such as where applicants have "sporadic work or seasonal income," "owners are expected to make a reasonable judgment as to the most reliable approach to estimating what the tenant will receive during the year") (emphasis in original).

Most importantly of all, Ms. Patel herself submitted *a signed and notarized declaration* attesting that her household's income was below the maximum allowable amount. Defs.' Mot., Ex. 26, ECF No. 67-26 (Patel Declaration of Eligibility). Ms. Patel's Intake Form also indicated that her monthly income was $3,000 which, annualized, constituted a sufficiently low income to qualify her for the program. Pl.'s Mot., Ex. 72, ECF No. 68-76 (Patel Universal Intake Form). Allegedly, Ms. Patel failed to disclose certain income, property or other sources of wealth on these documents—discoveries Plaintiff has made through various means, including by reviewing documents the District was not given by Ms. Patel. But Plaintiff, who concedes that Ms. Patel was dishonest and attempted to "game" the system, Pl.'s Mot. at 33 ("Ms. Patel certainly bears a measure of responsibility for her dishonesty and attempt to 'game' the system"), cannot seriously suggest that Ms. Patel's perjury during the application process demonstrates that the District acted with any "private" purpose in administering the IZ Program.[18] If anything, the District

---

[18] For the same reason, the Court does not find persuasive Plaintiff's argument that Defendants' failure to incorporate spousal income into their projection is somehow evidence of the alleged "sham." As an initial matter, Ms. Patel has testified that she is not legally married to the father of her children despite Plaintiff's belief otherwise, and even Plaintiff only claims that this individual is "either" her husband or "fiancé." Pl.'s Mot., Ex. 7 at ¶ 19. Regardless, Plaintiff does not contend that the District knew Ms. Patel was married but failed to consider her husband's income. Plaintiff simply claims Defendants failed to determine her marital status. But Defendants were not required to specifically inquire as to Ms. Patel's marital status—they were required to consider the annual income of the applicant's household. D.C. Mun. Regs. tit. 14, § 2213. Ms. Patel told the District that her household was to include only her and her child.

employees involved acted reasonably in relying on Ms. Patel's signed statements given that perjury is a felony in the District of Columbia, punishable by up to ten years in prison.  D.C. Code § 22-2402.

Before concluding, the Court notes for the record that it has reviewed all of the other evidence Plaintiff has put forth regarding the Patel transaction, and none of it supports Plaintiff's private purpose theory.  Of particular note, the series of emails exchanged between Darryl Featherstone and Chris Marshall during November, 2014, Pl.'s Mot., Ex. 68, ECF No. 68-72, do not show that Defendants altered Ms. Patel's income to make it appear lower than they knew it to be, as Plaintiff insinuates in its papers.  Instead, those emails are clearly about the fact that Ms. Patel's paperwork at that time stated that her income was *too low* for the IZ Program, because a box was checked on one of her forms that indicated that she would be spending more than 41% of her monthly income on the purchased unit.  *Id.* at 1.  In the e-mails, Mr. Featherstone stated that this was an error because, regardless of the metric Defendants used to calculate Ms. Patel's fluctuating income, she would not exceed the 41% threshold and was accordingly eligible.  *Id.*; Pl.'s Mot., Ex. 69, ECF No. 68-71 (February 3, 2016 Deposition of Darryl Featherstone), at 53:5-9 ("Q: So you were focusing here to make sure that her income was high enough to pay the mortgage basically? That's what the 41 percent is for, correct? A: Yeah.").  This same mistake is clearly what was referenced in the December 12, 2014 e-mail from Chris Marshall in which he stated: "Please disregard the income specified in the 'COIAH_Patel.pdf' document.  Subsequent calculations confirmed that she is income-eligible for this unit."  Pl.'s Mot., Ex. 61, ECF No. 68-

---

Pl.'s Mot., Ex. 72 at 2.  The Court is hard pressed to see how the District basing its calculations on this representation is somehow evidence of fraudulent intent or non-public purpose in the administration of the IZ Program.

65, at 15.  This evidence is simply not susceptible to the implication suggested by Plaintiff: that Defendants re-calculated Ms. Patel's income to make it appear low enough to be eligible for the IZ Program.  Such a theory is nonsensical, because Ms. Patel's "COIAH" document states that her income was $40,882, which was *already below* the allowable maximum income.  Pl.'s Mot., Ex. 66.

In short, none of Plaintiff's evidence regarding the Patel transaction indicates that the District's purpose in administering the program was anything other than the public one animating the program in general.  At most, interpreted in the light most favorable to Plaintiff, the evidence shows that Ms. Patel made certain omissions and misrepresentations about her eligibility, and that if District employees had dug deeper, been less trusting, exercised more diligence, or interpreted Ms. Patel's documents more conservatively, they may have discovered the truth.  But without any probative evidence of a private purpose, the allegedly imperfect execution of a government program alone does not give rise to a constitutional violation.  *See*

*Kelo*, 545 U.S. at 480 ("'it is only the taking's purpose, and not its mechanics,' . . . that matters in determining public use").[19]

Accordingly, even had the Court concluded that a taking had occurred, Plaintiff's public use challenge would fail for lack of evidence. Defendants are entitled to summary judgment on Plaintiff's takings claim in its entirety.[20]

## B.  Plaintiff's Equal Protection Claim

Although this case is, in essence, about an alleged taking, Plaintiff has also attempted to frame the preceding facts as violations of various other constitutional guarantees. The Court first addresses Plaintiff's equal protection claim. Specifically, Plaintiff states that it is pursuing a "class of one" equal protection claim. Pl.'s Opp'n at 28-29. "A 'class of one' equal protection claim may be maintained 'where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 75 (D.D.C. 2015) (quoting *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000)). There are "two essential elements of [a] 'class of one' equal protection claim: (1) disparate treatment of similarly situated parties (2) on no rational basis." *3883 Connecticut LLC v. D.C.*, 336 F.3d 1068, 1075 (D.C. Cir. 2003).[21]

---

[19] Because the Court grants Defendants summary judgment as to Plaintiff's private takings claim, it need not address Defendants' alternative argument that the relief Plaintiff seeks in that claim is unavailable because of certain language in the IZ Covenant and the failure to include Ms. Patel as a party to this action.

[20] The parties also dispute whether either is entitled to summary judgment on the question of just compensation. Pl.'s Mot. at 28; Defs.' Opp'n at 18. Because the Court grants summary judgment in favor of Defendants and against Plaintiff on Plaintiff's takings claim in its entirety, Plaintiff is not entitled to just compensation.

[21] Plaintiff concedes that it is not a member of a protected class, and that its claim is subject to rational basis review. Pl.'s Opp'n at 28; Defs.' Mot., Ex. 3 at 6 (Plaintiff's response to

Here, Plaintiff argues that it has been treated differently because it was the only developer subject to the IZ Program that was "unable to take advantage of density bonuses," was the only developer to carry two IZ Units before the District revised the IZ Covenant so that IZ participants could take advantage of HUD-insured mortgages, and because it carried its IZ Units for longer than other developers.  Pl.'s Mot. at 34-37; Pl.'s Opp'n at 29.  Plaintiff also revives under this cause of action its allegation that Ms. Patel was fraudulently certified to participate in the IZ Program.  *Id.*

The Court begins by noting that it has already rejected some of these claims as unsupported by evidence or counter to the record.  For example, Plaintiff's argument that the District prevented it from incorporating "bonus density" into its building plans is based on its claim that the IZ Program only became applicable in December of 2009 and without a phase-in period.  As discussed above, this is wrong.  The Program became applicable on August 14, 2009, after a phase-in period.  Plaintiff also suggests that it was treated differently because it was the only developer "forced to transfer his property to a patently ineligible real estate speculator in an illegal private use taking," Pl.'s Opp'n at 29, but the Court has already explained above that this allegation is not supported by sufficient evidence to survive summary judgment.

More fundamentally, however, Plaintiff's equal protection claim fails as a matter of law because although Plaintiff claims that the manner in which the District applied the IZ Program to Plaintiff was unfair for various reasons, it fails to show that the District applied that program to any other developer in a different manner.  *See Tate v. D.C.*, 627 F.3d 904, 910 (D.C. Cir. 2010) (equal protection claim that plaintiff "was singled out for harsh treatment" failed because

---

Defendant's twelfth request for admission, admitting that it is not a member of a suspect class).

plaintiff had "not identified any similarly situated person . . . who was treated differently");

*Quezada v. Marshall*, 915 F. Supp. 2d 129, 135 (D.D.C. 2013) ("This requirement is not a mere

formality.  Rather, it serves to distinguish claims to the treatment that was afforded others, which

can be cognizable under principles of equal protection, from bare complaints of governmental

unfairness, which cannot").  The mere fact that the IZ Program had certain unique effects on

Plaintiff because Plaintiff was the first developer to be subject to its requirements does not give

rise to an equal protection claim, because it does not show that the District applied the IZ

Program to Plaintiff in a different way than it applied it to anyone else similarly situated.  *See*

*3883 Connecticut LLC*, 336 F.3d at 1075 (affirming dismissal of equal protection claim where

developer "showed only that the District had never before required an EIS for an apartment

building project," which says "nothing about what requirements the District had imposed upon

other projects before ultimately determining no EIS was required, which was Clark's situation").

Because Plaintiff has not established any disparate treatment of similarly situated parties,

Defendants are entitled to summary judgment on Plaintiff's equal protection claim.

## C.  Plaintiff's Substantive Due Process Claim

Defendants are also entitled to summary judgment on Plaintiff's substantive due process

claim.  As an initial matter, the IZ Program as a whole clearly survives a facial substantive due

process challenge.  Plaintiff concedes that no fundamental right is at issue here, and accordingly

the IZ Program "is subject only to rational basis scrutiny."  *Abigail All. for Better Access to*

*Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 712 (D.C. Cir. 2007).  "The rational

basis test requires that [Plaintiff] prove that the government's restrictions bear no rational

relationship to a legitimate state interest."  *Id.*  Here, the District's affordable housing goals

constitute a legitimate state interest, and requiring developers of real estate to rent or sell portions

of their developments at affordable prices to low income individuals is rationally related to that interest.  Plaintiff makes no serious effort to argue otherwise.

Plaintiff's apparent as-applied challenge to the IZ Program is only slightly more colorable, and also fails.  "To assert a substantive due process violation [ ] the plaintiff must [ ] show that the District of Columbia's conduct was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  *Butera v. D.C.*, 235 F.3d 637, 651 (D.C. Cir. 2001) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)); *see also George Washington Univ. v. D.C.*, 318 F.3d 203, 209 (D.C. Cir. 2003) (plaintiff must demonstrate "egregious government misconduct"); *Tri Cty. Indus., Inc. v. D.C.*, 104 F.3d 455, 459 (D.C. Cir. 1997) (the doctrine prohibits "actions that in their totality are genuinely drastic").  "This stringent requirement exists to differentiate substantive due process, which is intended only to protect against arbitrary government action, from local tort law."  *Butera*, 235 F.3d at 651.  The Court of Appeals has determined that the "'grave unfairness'" required for the type of substantive due process claim argued by Plaintiff here can by shown by "[1] a substantial infringement of state law prompted by personal or group animus, or [2] a deliberate flouting of the law that trammels significant personal or property rights."  *Tri Cty. Indus.*, 104 F.3d at 459 (quoting *Silverman v. Barry,* 845 F.2d 1072, 1080 (D.C. Cir. 1988)).

Plaintiff believes that it has satisfied this "admittedly high," Pl.'s Opp'n at 27-28, standard with a laundry list of its complaints and frustrations about the District's administration of the IZ Program.  It has not done so.  Although significant in quantity, none of Plaintiff's complaints are of the grave, egregious or shocking quality that is required for this constitutional claim.

48

First, Plaintiff again relies on the District's certification of Ms. Patel as eligible for the IZ Program.  But as the Court has already explained above, Plaintiff's accusations of "fraud" or "cooking the books" are simply not supported by evidence.  At most, Plaintiff has demonstrated that some combination of mistakes or a lack of diligence on the part of the District on the one hand, and potentially false or incomplete representations of the applicant on the other, led to an ineligible individual participating in the IZ Program.  Such mistakes do not give rise to substantive due process claims, because for the purposes of substantive due process, "'[i]nadvertent errors, honest mistakes, agency confusion, even negligence in the performance of official duties, do not warrant redress.'"  *Elkins v. D.C.*, 527 F. Supp. 2d 36, 49 (D.D.C. 2007) (quoting *Silverman*, 845 F.2d at 1080).  Even to the extent Plaintiff had demonstrated that the District failed to follow certain regulations or procedures in certifying Ms. Patel, "[a] mere violation of law or deviation from regulations and procedures has been found insufficient to support a substantive due process claim."  *Id.*; *see also George Washington Univ.*, 318 F.3d at 210 ("a breach of local law does not of itself violate substantive due process.").  Although the parties may genuinely dispute how the District could have most accurately projected Ms. Patel's household's annual income, there was nothing so inherently unreasonable about the District's methods or conclusions so as to constitute "a deliberate flouting of the law."  *Tri Cty. Indus.*, 104 F.3d at 459.

The remainder of the complaints leveled by Plaintiff are similarly insufficient.  The fact that District employees overlooked the need to apply the IZ Program when they first reviewed Plaintiff's building permit application and then later corrected themselves certainly does not constitute severe enough illegal conduct or unfairness to support a substantive due process claim. As an initial matter, although Plaintiff complains that the District only caught the fact that

49

Plaintiff's application was subject to the IZ Program by happenstance, Plaintiff does not appear to contest that the IZ Program *in fact applied* to its development.  It is difficult to comprehend how Plaintiff could assert that the eventual decision of the Zoning Office to apply the IZ Program, which undisputedly *did* apply to Plaintiff's development, is somehow a violation of Plaintiff's substantive due process rights.  With respect to the initial failure to require IZ Program compliance, Plaintiff does not contend that this was caused by anything other than oversight, or perhaps negligence, which is "categorically beneath the threshold of constitutional due process." *Butera*, 235 F.3d at 651 (quoting *Cty. of Sacramento*, 523 U.S. at 848-49); *see also Elkins v. D.C.*, 690 F.3d 554, 562 (D.C. Cir. 2012) (the fact that District officials "'sent out mixed messages' . . . at most show[ed] 'agency confusion,' not the 'grave unfairness' required for a substantive due process claim").

Similarly, Plaintiff's complaints regarding the IZ Covenant, although dressed in rather inflammatory language, essentially are critiques of the efficacy the District's IZ Program as originally implemented.  Although Plaintiff at times refers to the IZ Covenant as "illegal" when first drafted, *see, e.g.*, Pl.'s Opp'n at 23, such a claim is not supported by the record.  At most, the IZ Covenant was incompatible with certain requirements for obtaining a HUD-insured mortgage, making it difficult for low-income purchasers to obtain financing to purchase IZ Units and therefore making it more difficult to locate purchasers for the IZ Program.  There is nothing "illegal" about this, and indeed it appears that other jurisdictions have similar requirements. Defs.' Mot., Ex. 28, ECF No. 67-28 (May 5, 2015 Deposition of Rachel Meltzer), at 78:21-79:19 (stating that inclusionary zoning programs in San Francisco and Boston do not allow for the release of inclusionary zoning restrictions upon foreclosure).  Nor does this constitute "irrational" government conduct—the District presumably drafted the IZ Covenant in this way

not out of animus or flouting of any law, but because it wanted the IZ restrictions to survive foreclosure to ensure the continued availability of affordable housing.  In short, although the District has now amended the IZ Covenant in hopes of improving the IZ Program, there was nothing irrational or illegal about how it crafted the covenant initially.

Plaintiff also complains about the District's refusal to exempt Plaintiff from the IZ Covenant.  However, the District was never under any obligation to do so.  To the extent Plaintiff complains that the District denied its requests for exemption because it incorrectly believed it did not have the authority to exempt Plaintiff based on a misinterpretation of the applicable regulations, this is insufficient to support a substantive due process claim.  *See Am. Fed'n of Gov't Employees, AFL-CIO, Local 2798 v. Pope*, 808 F. Supp. 2d 99, 111 (D.D.C. 2011), *aff'd*, No. 11-5308, 2012 WL 1450584 (D.C. Cir. Apr. 12, 2012) ("Any legal errors in the General Counsel's decision not to issue a complaint on the plaintiffs' unfair labor practice charge or in the calculation of the timeliness of the plaintiffs' motion for reconsideration would not rise to the level of substantive due process violation."); *Chang v. D.C. Dep't of Regulatory & Consumer Affairs*, 604 F. Supp. 2d 57, 64 (D.D.C. 2009) ("While Mr. Masoero may have been incorrect in his interpretation of the Construction Codes, plaintiff has not alleged any motivation on the part of defendants that would make such an allegation amount to stating a claim for a substantive due process violation.").[22]

---

[22] The Court notes that at various times throughout its papers Plaintiff also suggests that the District "hid" the IZ Covenant.  This is another example of Plaintiff's use of rhetoric that is unsupported by the record.  Plaintiff's evidence shows that a PDF of the IZ Covenant was taken down from a DHCD website while changes were being made to it in response to comments, but was still available upon request.  Pl.'s Mot., Ex. 20, ECF No. 68-22 (August 26, 2009 e-mail from Eric Jenkins) ("if there is an issue with DCBIA review, the covenant can just be pulled from the site until all reviews have been made.  Any requests for the covenant can come through the appropriate DHCD/DMPED rep.  That way we can track and manage the covenants until it is

Finally, the District's failure to publish certain annual reports—even if said reports were required by law—is similarly far from sufficient to support Plaintiff's substantive due process claim.  The Court notes that it fails to see how this has harmed Plaintiff or shows any unfairness to Plaintiff at all.  Regardless, like Plaintiff's numerous other complaints, this failure to timely comply with annual reporting requirements is clearly insufficient to establish the "grave unfairness" or "deliberate flouting of the law" required to establish a substantive due process claim.  *See George Washington Univ.*, 318 F.3d at 210; *Elkins*, 527 F. Supp. 2d at 49 (mere "deviation from regulations and procedures" is insufficient to establish violation of substantive due process).

In sum, the Court finds that although Plaintiff has found numerous aspects of the District's administration of the IZ Program frustrating—and perhaps rightfully so—Plaintiff has not presented evidence of the type of extreme, unfair, egregious or shocking conduct necessary to establish a violation of its substantive due process rights.  "In so doing, [the Court] do[es] not say that the District's actions were ideal."  *Silverman*, 845 F.2d at 1080.  It merely holds "that at no point did the District's [administration of the IZ Program] rise to the level of a constitutional violation."  *Id.* (agreeing with district court's assessment that list of complaints regarding how the District handled plaintiff's application for apartment building conversion showed that the District was "beset by 'confusion'" implementing new law, but that this was insufficient to show a substantive due process violation).

---

fully reviewed").  This simply does not support Plaintiff's suggestion that Defendants "hid" the IZ Covenant, nor Plaintiff's repeated insinuations of bad faith on this score.

**D.  Plaintiff's Procedural Due Process Claim**

Finally, Plaintiffs also argue that Defendants have violated Plaintiff's procedural due process rights.  "A procedural due process violation occurs when an official deprives an individual of a liberty or property interest without providing appropriate procedural protections." *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009).  "The three basic elements of a procedural due process claim are (1) a deprivation, (2) of life, liberty, or property, (3) without due process of law."  *Morris v. Carter Glob. Lee, Inc.*, 997 F. Supp. 2d 27, 35-36 (D.D.C. 2013).  Plaintiff's briefing on this claim, which amounts to little more than a restatement of most if not all of Plaintiff's grievance about the IZ Program and conclusory statements that they constitute violations of Plaintiff's procedural due process rights, is not a model of clarity nor particularly helpful to the Court.  Plaintiff fails to cogently explain how each and every one of its complaints about the IZ Program, of which there are many, were deprivations of property without sufficient process of law.  Nonetheless, the Court can discern three potential property interests that Plaintiff was allegedly deprived of without sufficient process that could be at issue here.

First, to the extent Plaintiff's claims are based on the implementation of the IZ Program and that Program's effect on the profit Plaintiff was able to derive from its property, this claim fails because the IZ Program is a set of generally applicable regulations.  "[I]t is well established that statutes or ordinances of general applicability may condition or even prohibit the right to conduct a business without running afoul of procedural due process."  *Jones v. Air Line Pilots Ass'n*, 713 F. Supp. 2d 29, 36 (D.D.C. 2010) (quoting *Vaden v. Maywood,* 809 F.2d 361, 364 (7th Cir. 1987)).  The notice and comment process that preceded the enactment of the IZ regulations, described above in section I.B, was sufficient to satisfy any requirements of

53

procedural due process in this context. *See Pickus v. U.S. Bd. of Parole*, 543 F.2d 240, 244 (D.C. Cir. 1976) ("for 'legislative-type' rulemaking, notice and written comment procedures comport with due process").  Additionally, the Court notes that there was a procedure available to Plaintiff for requesting a waiver of the IZ Program's requirements by appealing to the District's Board of Zoning Adjustment.  D.C. Mun. Regs. tit. 11, § 2606.

Second, to the extent Plaintiff's claim is based on the D.C. Zoning Office granting initial zoning approval for Plaintiff's condominium building and then revoking that approval after realizing that the building should be subject to IZ Program restrictions, this claim fails because Plaintiff was not deprived of any "property."  What was revoked in this case was a preliminary zoning approval, not any actual permit to build.  This initial zoning approval appears to have been "merely a step towards the acquisition of the building permit." *Tri Cty. Indus., Inc. v. D.C.*, 104 F.3d 455, 458 (D.C. Cir. 1997).  Under well-settled law in this circuit, the District does not "'deprive[ ]' an applicant of 'property' whenever it backtracks on a prior favorable finding on one of those steps, independently of withdrawal of the permit itself." *Id.*

Finally, to the extent Plaintiff's claim is based on the District's alleged deprivation of Plaintiff's ability to use "bonus density," the Court reiterates its finding, explained above, that the basic premise underlying this claim—that the IZ Program became applicable on December 11, 2009 with no phase-in period—is not supported by the record.  The IZ Program became effective and applicable after a notice and comment period and a phase-in period on August 14, 2009.  Accordingly, the District simply did not deprive Plaintiff of any property interest it might have had in the bonus density available under the IZ Program.[23]

---

[23] The Court concludes that Defendants are entitled to summary judgment on Plaintiff's procedural due process claim for the reasons discussed herein, and accordingly does not need to

Accordingly, to the extent Plaintiff was deprived of any cognizable property right in this case, that deprivation occurred with sufficient process of law.  Plaintiff's procedural due process claim therefore fails.

## IV.  CONCLUSION

In sum, the Court finds that Defendants are entitled to summary judgment on each of Plaintiff's claims.  Plaintiff's various grievances about the District's implementation of its IZ Program, although perhaps not completely unjustified, do not rise to the level of constitutional violations.  Plaintiff has not established that regulations that restricted Plaintiff's use of only 8-10% of its development constituted an unconstitutional taking.  Nor has Plaintiff established that it was treated differently than any other developer under the IZ Program, or that anything about the IZ Program or its implementation violated Plaintiff's substantive or procedural due process rights.  Accordingly, Defendants' [67] Renewed Motion for Summary Judgment is GRANTED and Plaintiff's [68] Motion for Summary Judgment is DENIED.[24]  An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE

---

reach Defendants' alternative argument that this claim is barred by the statute of limitations.

[24] Because Plaintiff does not prevail on any of its claims, Plaintiff's request for attorney's fees is denied.